

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

ENTERED
07/16/2013

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 09–36608 |
| **SHONTEL & SARIKA BRADLEY,** | § | |
| | § | Chapter 7 |
| Debtor. | § | |

## MEMORANDUM OPINION ON SHOW CAUSE ORDER
[Doc. No. 157]

### I. INTRODUCTION

The Court writes this Memorandum Opinion for two reasons: (1) to reiterate the central importance of professional and ethical conduct in the practice of law; and (2) to inform the debtors' bar that the undersigned judge has now become sufficiently disenchanted with the use of appearance attorneys that henceforth, their use will no longer be permitted.[1]

The professional handling of a debtor's case and the correct filing of accurate schedules and other court documents are paramount to the proper practice of bankruptcy law. The case at bar involves both the debtor's attorney, Nosa Aduwa (Aduwa), and the firm that employs him, Macey Bankruptcy, P.C. (the Firm). Aduwa failed to personally meet with his clients, Shontel and Sarika Bradley (the Debtors), or review their Schedules and Statements of Financial Affairs (SOFA) before filing them with this Court. Additionally, Aduwa filed these documents without obtaining either the Debtors' signatures, or their authorization. In fact, Aduwa allowed his

---

[1] "Appearance attorneys" are attorneys who, at the request of the debtors' chosen attorney, appear and attempt to represent debtors at meetings of creditors and hearings on behalf of the debtors' attorney. An appearance attorney is neither a partner nor an associate at the law firm retained by the debtor. Rather, appearance attorneys are solo practitioners who generate income typically by contracting with multiple firms to represent their clients at proceedings at the courthouse. These lawyers are almost never disclosed to the court prior to their appearance, and debtors are often unaware that an appearance attorney will be representing them until they meet the attorney— usually mere minutes before a hearing or a meeting of creditors begins. *See* Geraldine Mund, *Paralegals: The Good, the Bad and the Ugly*, 2 AM. BANKR. INST. L. REV. 337, 342 (1994).

assistant, Aurelia Gutierrez (Gutierrez), to forge the Debtors' signatures on these documents using an electronic signature represented as an "/s/".  In addition, Gutierrez made changes to the Schedules before forging the Debtors' signatures, and she also counseled the Debtors to convert to Chapter 7; thus she engaged in the practice of law without a license.  And, there is more. Aduwa failed to accompany the Debtors to their meeting of creditors; instead, he sent Rick Carter (Carter), an "appearance attorney," in his stead.  Aduwa failed to adequately prepare Carter for the hearing and did not notify the Debtors of the substitution prior to the meeting.

As Aduwa's employer, the Firm has failed in its duty to supervise him.  Findings by the Court indicate that the improper practices outlined throughout this Opinion are not as rare as the Firm asserts.  Such practices are directly related to the Firm's poor supervision of its attorneys and other personnel.  This Opinion discusses how Aduwa's improper preparation and filing of the Debtors' Schedules and SOFA, as well as the other failures by Aduwa, his staff, and the Firm, have demonstrated clear disregard for the professional, ethical, and legal obligations required by both their status as attorneys and by the legal system.

The Court now issues findings of fact and conclusions of law pursuant to Bankruptcy Rules 7052 and 9014.[2]  To the extent that any finding of fact is construed as a conclusion of law, it is adopted as such.  To the extent that any conclusion of law is construed as a finding of fact, it is also adopted as such.  The Court reserves the right to amend these findings and conclusions pursuant to any request made by the parties or on its own.

---

[2] Any reference to "the Code" refers to the United States Bankruptcy Code, and reference to any section (i.e., §) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code, unless otherwise noted.  Further, any reference to "the Bankruptcy Rules" refers to the Federal Rules of Bankruptcy Procedure.  Any reference to "the Local District Rules" refers to the Local Rules of the United States District Court for the Southern District of Texas. Any reference to "the Local Bankruptcy Rules" refers to the Local Rules of the United States Bankruptcy Court for the Southern District of Texas.

**II. FINDINGS OF FACT**

1.  On September 2, 2009 (the Petition Date), the Debtors, having already engaged the Firm to represent them, filed a Chapter 13 petition.  [Doc. No. 1].  James Ferguson (Ferguson), an attorney employed at the Firm, signed the petition, and thereby became the attorney-in-charge.  *See* Local District Rule 11.1 ("On first appearance through counsel, each party shall designate an attorney-in-charge.  Signing the pleading effects designation.").

2.  On September 2, 2009, the Firm filed a disclosure pursuant to Bankruptcy Rule 2016 (Rule 2016 Disclosure) representing that: (a) the total fees for the Firm's representation of the Debtors would be $3,085.00; (b) of the total fees, $1,000.00 had been paid prior to the Petition Date; and (c) the remaining $2,085.00 would be paid through the Debtors' Chapter 13 plan.  [Doc. No. 1 at 35].

3.  On September 28, 2009, Ferguson filed a "Motion to Withdraw as Attorney for the Debtors," citing his impending departure from the Firm as the reason and requesting the Court to substitute Martin Pack (Pack) as the attorney-in-charge.  [Doc. No. 17].  The Court issued an "Order Authorizing Withdrawal of Counsel" on October 5, 2009.  [Doc. No. 21].  Thereafter, Pack became the attorney-in-charge subject to Local District Rule 11.1.

4.  On October 28, 2009, the Firm filed its "Bankruptcy Rule 2016(b) Disclosure and Application for Approval of Fixed Fee Agreement."  [Doc. No. 31].

5.  On November 16, 2009, this Court confirmed the Debtors' original Chapter 13 Plan (the Plan).  [Doc. No. 39].

6.  On November 25, 2009, this Court entered an order denying the fee arrangement between the Firm and the Debtors.  [Doc. No. 43].  The Court issued this order because the Firm

did not comply with the form adopted on May 20, 2009, by the Southern District of Texas.  Further, the application for approval of fixed fee agreement was not timely filed pursuant to Local Bankruptcy Rule 2016-1(d)(1).  [*Id.*].

7.     On December 4, 2009, in response to this Court's order of November 25, 2009, the Firm filed a third Rule 2016 Disclosure.  [Doc. No. 45].  This disclosure once again listed the total compensation as $3,085.00, with $1,000.00 already paid to the Firm by the Debtors.

8.     On January 14, 2010, this Court entered an order approving the fee arrangement between the Firm and the Debtors.  [Doc. No. 48].  The fee arrangement provided that Pack agreed to represent the Debtors in their Chapter 13 case, to include: advising them as necessary, preparing and filing all required documents, motions, or responses, and attending the meeting of creditors.  [Doc. No. 45 at 1].  The arrangement with Pack did not include representation relating to any adversary proceedings, contested matters considered extraordinary in the context of a Chapter 13 case, or any hearings scheduled more than 120 days after the confirmation of the Plan.  [*Id.*].  The agreement also stated that Pack had not shared or agreed to share any of his compensation (i.e., the $3,085.00 with $1,000.00 already paid).  [*Id.* at 2].

9.     On March 3, 2010, Pack filed a motion to substitute attorney for the Debtors on the grounds that he was leaving the Firm.  [Doc. No. 50].  The Court denied the motion because, among other reasons, the Debtors' signatures did not appear on the motion. [Doc. No. 51].

10.    On April 2, 2010, Pack filed a second motion to substitute counsel, and this time, the Debtors' signatures were on the motion.  [Doc. No. 53].

11.    On May 10, 2010, this Court approved the second motion to substitute counsel.  [Doc. No. 54].  Terena S. Molo (Molo), an associate attorney at the Firm, replaced Pack as the attorney-in-charge.  [*Id*.].

12.    On January 25, 2011, Tiffany Pratt (Pratt), who was also an associate attorney at the Firm, filed a "Debtors' Motion to Terminate Attorney."  [Doc. No. 73].  The motion requested that Molo be removed from the case because she was no longer employed at the Firm, and that Pratt be substituted in as the attorney-in-charge.  [*Id*. at 1–2].  The Debtors signed this motion.  [*Id.* at 2].

13.    On March 15, 2011, the Firm filed an amended Rule 2016 Disclosure representing that, contrary to prior representations made to this Court, the Firm had actually received $1,150.00 from the Debtors prior to the Petition Date—as opposed to the $1,000.00 set forth in the earlier Rule 2016 Disclosures; and that, therefore, the balance owed by the Debtors to the Firm (which was being paid in monthly installments pursuant to the Plan) was not $2,085.00, but rather $1,935.00.  [Doc. No. 77].

14.    On March 15, 2011, Pratt, on behalf of the Debtors, filed a motion to modify the Plan because the Debtors had fallen behind on their payments due under the Plan.  [Doc. No. 74].

15.    On April 26, 2011, Pratt, once again on behalf of the Debtors, filed an amendment to the motion to modify the Plan.  [Doc. No. 85].

16.    On May 9, 2011, this Court approved the amended proposed modification of the Plan (the Modified Plan).  [Doc. No. 89].  Thus, as of May 9, the Debtors were required to make payments pursuant to the Modified Plan.

17. On July 8, 2011, Pratt filed a motion to withdraw as attorney for the Debtors. [Doc. No. 95]. In this motion, Pratt represented that the Firm had terminated her employment on that day and that Aduwa would take over as the attorney-in-charge of the Debtors' case. [*Id*. at 1–2]. Indeed, on that same day, Aduwa filed two notices of appearance in this case, representing that he was taking over as the attorney-in-charge of the Debtors' case. [Doc. No. 93]; [Doc. No. 94].

18. On July 12, 2011, this Court entered an order approving Pratt's motion to withdraw as attorney-in-charge and substituting Aduwa in her place. [Doc. No. 97].

19. Aduwa has been the managing attorney in charge of the Firm's Houston office since 2010, [Tape Recording, Apr. 26, 2013 Hearing at 10:17:40–10:17:46 a.m.]; however, he is not a partner at the Firm, [*Id.* at 10:18:52–10:19:32 a.m.]. Aduwa is an experienced bankruptcy attorney, having handled over 600 bankruptcy cases before joining the Firm. [*Id.* at 10:34:31–10:35:05 a.m.].

20. Aduwa has never been subject to sanctions prior to this case. [*Id.* at 10:35:15–10:35:30 a.m.].

21. Aduwa currently has one legal assistant, Gutierrez. She has worked in the bankruptcy field since 2007. [*Id.* at 10:50:41–10:51:30 a.m.]. Gutierrez has been with the Firm, and acting as Aduwa's assistant, since November 2010. [*Id*.]. Currently, the Firm's Houston office is staffed by Aduwa, Gutierrez, and one part time clerk. [*Id.* at 10:17:38–10:18:02 a.m.].

22. On October 4, 2012, the Chapter 13 Trustee filed a motion to dismiss the Debtors' case on the grounds that the Debtors were 2.22 months behind on their payments under the Modified Plan. [Doc. No. 106].

23.     On October 15, 2012, Aduwa, after communicating by telephone with both of the Debtors, filed a response to the Chapter 13 Trustee's motion to dismiss. [Doc. No. 108]. This response set forth that the Debtors intended to make their payments current, and requested that this Court deny the Chapter 13 Trustee's motion to dismiss. [*Id.*].

24.     A hearing on the Trustee's motion to dismiss took place on December 3, 2012. [Doc. No. 109]. At the conclusion of the hearing, the Court entered an order setting December 17, 2012, as the deadline for the Debtors to cure their defaults under the Modified Plan, request an amendment to the Modified Plan, or request a conversion of their Chapter 13 case to a Chapter 7 case. [Doc. No. 109]; [Doc. No. 111].

25.     On December 17, 2012, the following pleading was electronically filed from the Firm's Houston office: "Notice of Voluntary Conversion from Chapter 13 to Chapter 7" (the Notice of Conversion). [Doc. No. 117]. Aduwa, who was on vacation at this time, had telephonically instructed Gutierrez to prepare and file the Notice of Conversion, which she did using Aduwa's CM/ECF log-in. [Doc. No. 170 at 4–5, ¶ 12]. A review of this document, however, reflects that it was represented to be electronically signed (with an "/s/") *not* by Aduwa, but by Pack, [Finding of Fact No. 11]—even though Pack had resigned from the Firm in 2010. Moreover, the Notice of Conversion contains each of the Debtors' electronic signatures ("/s/"), thereby representing to this Court that both of the Debtors had in fact physically signed the original Notice of Conversion in ink and that the Firm had possession of this document.[3] In fact:

---

[3] "[D]ebtors must sign the petition, Schedules, and Statement of Financial Affairs as a means of not only authorizing the filing of these documents, but of verifying, under penalty of perjury, that they have reviewed the information contained therein and that it is true and correct to the best of their knowledge." *In re Stomberg*, 487 B.R. 775, 807 (Bankr. S.D. Tex. 2013). The debtors' signatures in ink—otherwise known as "wet" signatures—are required on all filings in order to serve as verification of their validity and authenticity. Additionally, the Administrative

a.     Neither of the Debtors ever signed the Notice of Conversion, [Doc. No. 140 at 3, ¶ 17]; [Doc. No. 170 at 4–5, ¶ 12];

b.     Pack never signed the Notice of Conversion, [Doc. No. 140 at 3, ¶ 14]; [Doc. No. 170 at 4–5, ¶ 12];

c.     Aduwa never reviewed the Notice of Conversion before Gutierrez filed it, [Doc. No. 140 at 2–3, ¶¶ 12–17]; [Doc. No. 166 at 4–5, ¶¶ 11,12]; [Doc. No. 170 at 4–5, ¶¶ 11, 12];

d.     Prior to the filing of the Notice of Conversion, Aduwa did not personally meet with either of the Debtors to review the meaning or effect of the Notice of Conversion, [Doc. No. 170 at 3–5, ¶¶ 7–12]; [Tape Recording, Apr. 26, 2013 Hearing at 11:59:13–11:59:29 a.m.];

e.     Neither of the Debtors came into the Firm's office on December 17, 2012, to meet with Gutierrez, [Doc. No. 170 at 4–5, ¶ 12]; and

f.     Contrary to Aduwa's representation in the Motion Response that he filed on February 19, 2013, [Doc. No. 140 at 3, ¶¶ 15, 17], Sarika Bradley (Ms. Bradley) did *not* give Gutierrez any information on December 17, 2012, that allowed Gutierrez to prepare and file the Notice of Conversion, or any other document, [Doc. No. 170 at 4–5, ¶ 12].

---

Procedures for the Filing, Signing, and Verifying of Documents by Electronic Means in Texas Bankruptcy Courts (the Administrative Procedures for Electronic Filing) control electronic filings in this Court.  Section III, part B, paragraph 4 for the Administrative Procedures for Electronic Filing requires attorneys filing documents electronically to retain the original, "wet" signed documents for five (5) years after the case is closed.

26.     Ms. Bradley went to Aduwa's office on December 18, 2012, and paid $550.00 for the conversion of the case from Chapter 13 to Chapter 7.[4]  [Tape Recording, Apr. 26, 2013 Hearing at 12:01:10–12:02:15 p.m.]; *see also* [Doc. No. 132-2 at 2].  Of the total payment made to the Firm, $26.00 went towards paying the filing fees for converting the case to a Chapter 7.  The Firm kept the remaining $524.00 as attorneys' fees.  [Tape Recording, Apr. 26, 2013 Hearing at 12:22:46–12:23:14 p.m.].

27.     At some point in December 2012, Gutierrez informed Ms. Bradley that her husband and she would need to provide the Firm with updated information so that the conversion Schedules (the Initial Conversion Schedules) and the conversion SOFA (the Initial Conversion SOFA) could be filed.[5]  [Doc. No. 170 at 4–5, ¶ 12].

28.     The deadline for filing the Initial Conversion Schedules and the Initial Conversion SOFA was January 2, 2013.

29.     Both parties agree that the Debtors did not provide the information to Gutierrez until after the January 2, 2013 deadline for filing the Initial Conversion Schedules and the Initial Conversion SOFA.  Gutierrez claims Ms. Bradley sent her the information on either January 3, or January 4, 2013.  [*Id.* at 5, ¶ 13].  Ms. Bradley claims she gave Gutierrez the

---

[4] Ms. Bradley testified at the April 26, 2013 hearing on the SCO that she went to the Firm's office with $600.00 in cash and was told by Gutierrez that she would have to get her own change.  Evidence from that hearing suggests that Ms. Bradley did indeed have $600.00 with her the day she paid for the conversion, but only transferred $550.00 of these funds to the Firm as payment.  [Tape Recording, Apr. 26, 2013 Hearing at 12:00:05–12:02:37 p.m.].

[5] Conversion Schedules are revised listings of assets and liabilities that must be filed subsequent to a case being converted from one Chapter to another.  Updated schedules are necessary to give the new trustee, as well as the creditors, the most up to date and complete information about the debtor's liabilities, assets and sources of income.

information on January 6, 2013.  [Tape Recording, Apr. 26, 2013 Hearing at 12:03:12–12:04:05 p.m.].[6]

30.   Gutierrez prepared the Initial Conversion Schedules and the Initial Conversion SOFA before Ms. Bradley gave her the Debtors' updated financial information.  She prepared the Initial Conversion Schedules and the Initial Conversion SOFA using information taken from the original Chapter 13 Schedules and the original Chapter 13 Statement of Financial Affairs filed in 2009.  [Doc. No. 166 at 5, ¶ 13].

31.   Aduwa instructed Gutierrez to file the Initial Conversion Schedules and the Initial Conversion SOFA on January 4, 2013, which she did using Aduwa's CM/ECF log-in. [*Id*. at 5, ¶13; 9, ¶ 22]; [Doc. No. 121]; [Doc. No. 122].  The Initial Conversion Schedules and the Initial Conversion SOFA represent, by use of an "/s/" as an electronic signature, that Aduwa and both Debtors had physically signed the documents.  [Doc. No. 121 at 17, 25].

32.   Aduwa instructed Gutierrez to file the Initial Conversion Schedules and the Initial Conversion SOFA even though:

a.   Neither Aduwa nor Gutierrez had met with the Debtors to review the Initial Conversion Schedules and the Initial Conversion SOFA for accuracy.  [Doc. No. 170 at 6, ¶ 14; 9, ¶¶ 22, 23];

b.   Neither Aduwa nor Gutierrez had the Debtors physically sign (i.e., "wet" sign) the Initial Conversion Schedules or the Initial Conversion SOFA.  [*Id*.];

---

[6] Given that Gutierrez has already changed her recollection of one date, *see* [Finding of Fact No. 69]; [Doc. No. 170 at 4–5, ¶¶ 10, 12], and given that the Court gives greater weight to Ms. Bradley's testimony than to Gutierrez's testimony, the Court believes Ms. Bradley's testimony and finds that the information was transmitted on January 6, 2013.

c.  Aduwa knew that Mr. Bradley's employment and income information were not updated on either Schedule I of the Initial Conversion Schedules or question No. 1 on the Initial Conversion SOFA, and therefore Aduwa knew that they were inaccurate.  [*Id.* at 5–6, ¶ 13];

d.  Neither of the Debtors had authorized Aduwa or Gutierrez to file the Initial Conversion Schedules or the Initial Conversion SOFA.  [*Id.* at 6, ¶ 14].

33.  On January 6, 2013, Ms. Bradley provided Gutierrez with the updated employment and income information for Mr. Bradley.  [*Id.* at 5–6, ¶ 13]; [Tape Recording, Mar. 7, 2013 Hearing at 10:53:40–10:54:55 a.m.].   Gutierrez then prepared and filed amended conversion Schedules (the Amended Conversion Schedules) and an amended conversion SOFA (the Amended Conversion SOFA), at Aduwa's direction, to correct the inaccurate information contained in the Initial Conversion Schedules and the Initial Conversion SOFA that she had filed on January 4, 2013.  [Doc. No. 170 at 5–6, ¶ 13].  However, the resulting Amended Conversion Schedules were still incorrect, as Ms. Bradley pointed out at the meeting of creditors on January 8, 2013.  [Tape Recording, Jan. 8, 2013 Meeting of Creditors at 02:24–03:05].

34.  On January 7, 2013, Aduwa directed Gutierrez to file the Amended Conversion Schedules and the Amended Conversion SOFA, and she did so.  [Doc. No. 170 at 6, ¶ 14].   The Amended Conversion Schedules and the Amended Conversion SOFA represent by the use of an "/s/" as an electronic signature that Aduwa and both of the Debtors had physically signed the documents.  [*Id.*].

35.  Gutierrez filed these documents, under Aduwa's supervision, even though:

11

a.      Neither Aduwa nor Gutierrez had met with the Debtors to review the Amended
Conversion Schedules and the Amended Conversion SOFA for accuracy,  [*Id.*];

b.      Neither Aduwa nor Gutierrez had the Debtors physically sign (i.e., "wet" sign) the
Amended Conversion Schedules or the Amended Conversion SOFA, [*Id.*];

c.      Neither of the Debtors had authorized Aduwa or Gutierrez to file the Amended
Conversion Schedules or the Amended Conversion SOFA,  [*Id.*].

36.     The Amended Conversion Schedules, which Gutierrez prepared and filed, still contained
incorrect information regarding Mr. Bradley's employment and income.    [Tape
Recording, Jan. 8, 2013 Meeting of Creditors at 02:24–03:05].    Stated differently,
Gutierrez, despite knowing that the Initial Conversion Schedules she had filed on January
4, 2013, contained inaccurate information, still failed to correct the inaccuracies in the
Amended Conversion Schedules that she filed on January 7, 2013.  For his part, Aduwa
never reviewed the Amended Conversion Schedules and, therefore, failed to discover that
the information Gutierrez put in the documents was inaccurate.  [Doc. No. 170 at 6, ¶ 14].

37.     In addition to filing the inaccurate, unauthorized, and forged Initial Conversion
Schedules, Initial Conversion SOFA, Amended Conversion Schedules, and Amended
Conversion SOFA, Gutierrez also filed another document containing a material
inaccuracy.  On January 4, 2013, she filed the Firm's Rule 2016 Disclosure regarding the
fee that the Debtors had paid the Firm for agreeing to represent them in their converted
Chapter 7.  [*Id*. at 5–6, ¶ 13].  This disclosure, which represents that Aduwa signed it on
page 31, indicates to the Court that the amount of compensation received by the Firm for
converting the case was $26.00.  [*Id.*]; [Doc. No. 121 at 31]. In fact, the amount of

compensation paid by the Debtors to the Firm for the Chapter 7 representation was $524.00.  [Doc. No. 170 at 5–6, ¶ 13].

38.     The meeting of creditors in the converted Chapter 7 case was scheduled for 11:00 a.m. on January 8, 2013.  [Doc. No. 118].  With respect to this meeting of creditors, the following events took place:

a.      Aduwa did not personally meet with the Debtors to prepare them for the sworn testimony that they would have to give at the meeting, [Doc. No. 170 at 6, ¶ 15; 11, ¶ 25];

b.      Aduwa did not even communicate with the Debtors by telephone or email to prepare them for the sworn testimony they would have to give at the meeting, [*Id*.];

c.      Aduwa failed to advise the Debtors that he had a scheduling conflict, and that he would therefore be unable to attend the meeting, [*Id*.]; and

d.      Aduwa failed to notify the Debtors that Carter would be representing them at the meeting. [*Id*.].  Carter is an attorney-at-law who is *not* employed by the Firm, but rather is an independent contractor who serves as an appearance attorney for various law firms, including the Firm.[7]  [Doc. No. 170 at 6, ¶ 15].

39.     On January 8, 2013, Ms. Bradley travelled to the courthouse to attend the meeting of creditors.  Upon arrival, she was surprised to find that Carter was going to represent her at the meeting.  Just prior to the beginning of the meeting, Carter met with Ms. Bradley to review the Amended Conversion Schedules and the Amended Conversion SOFA with her, as Carter knew the Trustee would be asking Ms. Bradley questions about the

---

[7] See footnote number 1 for background on "appearance attorneys."

documents and the information contained therein.  Ms. Bradley informed Carter that the Amended Conversion Schedules and the Amended Conversion SOFA contained errors. [Doc. No. 132 at 4, ¶ 14]; [Tape Recording, Jan. 8, 2013 Meeting of Creditors at 02:24–03:05].

40.  Mr. Bradley, a truck driver, did not attend the January 8, 2013 meeting; he was on the road.  [Tape Recording, Jan. 8, 2013 Meeting of Creditors at 00:42–00:52].  Bankruptcy Local Rule 2003–1(a) requires the filing of a motion to excuse a debtor from a meeting of creditors; however, no such motion was filed prior to the January 8, 2013 meeting.[8]

41.  Once the January 8, 2013 meeting of creditors began, the Trustee learned of the inaccuracies in the Amended Conversion Schedules and the Amended Conversion SOFA. [Doc. No. 132 at 4–5, ¶ 15].  Moreover, Ms. Bradley informed the Trustee that she did not really want to be in Chapter 7, but rather, wanted to try and cure the default in the payments under the Modified Plan in the Chapter 13 case.  [Tape Recording, Apr. 26, 2013 Hearing at 11:56:27–11:57:11 a.m.].  The Trustee decided to continue the meeting of creditors to allow the inconsistencies in the Amended Conversion Schedules and the Amended Conversion SOFA to be corrected and, additionally, to allow Mr. Bradley to attend and testify about the information contained therein.  [Tape Recording, Jan. 8, 2013 Meeting of Creditors at 04:42–05:47].

42.  After the January 8, 2013 meeting of creditors, Carter notified Aduwa of the continued meeting and the deficiencies in the Debtors' Amended Conversion Schedules and the

---

[8] Aduwa should have filed a motion to excuse Mr. Bradley from this meeting.  Permission is needed from the Court before any debtor may miss a scheduled meeting of creditors.  The Court finds that Aduwa's failure to file this required motion is indicative of the woefully substandard representation that Aduwa provided to the Debtors.

Amended Conversion SOFA.  [Tape Recording, Jan. 22, 2013 Meeting of Creditors at 04:48–05:03; 05:38–05:45].

43. Ms. Bradley again emailed Mr. Bradley's updated earnings to the Firm on January 8, 2013.  [Doc. No. 132-1 at 3]; [Tape Recording, Jan. 22, 2013 Meeting of Creditors at 05:02–05:32, 05:55–06:06]; [Tape Recording, Mar. 7, 2013 Hearing at 10:53:40–10:54:55 a.m.].  This information was needed to correct the Amended Conversion Schedules.  It appears that Aduwa directed Gutierrez to file Schedule I (the Amended Conversion Schedule I) and Schedule J of the Amended Conversion Schedules on January 7, 2013, despite the fact that they still did not contain the Debtors' current financial information.  [Doc. No. 123 at 1]; [Doc. No. 170 at 5–6, ¶ 13].

44. There were glaring inconsistencies between the Amended Conversion Schedules and the Amended Conversion SOFA.  For example, the employer listed for Mr. Bradley on the Amended Conversion Schedule I was not his current employer, nor were the income amounts listed in item number one of the Amended Conversion SOFA accurate.  [Tape Recording, Mar. 7, 2013 Hearing at 10:56:35–10:58:34 a.m.]; [Tape Recording, Jan. 8, 2013 Meeting of Creditors at 02:28–03:06].  The Statement of Intent also incorrectly declared that the Debtors intended to surrender the vehicle used by Mr. Bradley for work purposes.  [Tape Recording, Jan. 8, 2013 Meeting of Creditors at 02:28–03:06].

45. The inaccuracies in the Amended Conversion Schedules and the Amended Conversion SOFA were not corrected before the continued meeting of creditors on January 22, 2013—the next amended Schedule I was not filed with the Court until after the continued meeting of creditors on January 22.  *See* [Finding of Fact No. 51].  Therefore, the Trustee

was still relying upon the inaccurate Amended Conversion Schedules and the Amended Conversion SOFA at the continued meeting of creditors.

46.     During the continued meeting of creditors held on January 22, 2013, the Debtors gave testimony about the continued inaccuracies in the Amended Conversion Schedules. [Tape Recording, Jan. 22, 2013 Meeting of Creditors at 02:47–07:05]; *see also* [Doc. No. 170 at 7, ¶ 17].

47.     Ms. Bradley further testified that she and her husband did not review or sign the Initial Conversion Schedules, the Initial Conversion SOFA, the Amended Conversion Schedules, or the Amended Conversion SOFA.  [Tape Recording, Jan. 22, 2013 Meeting of Creditors at 06:30–07:07]; *see also* [Doc. No. 132 at 5, ¶ 16]; [Doc. No. 166 at 7, ¶ 17].

48.     Ms. Bradley incorrectly testified at the opening of the January 22, 2013 continued meeting of creditors that she "had reviewed and signed with her own signature the Petitions, Schedules, SOFA, and other documents filed in this proceeding," when in fact she had not.  [Tape Recording, Jan. 22, 2013 Meeting of Creditors at 01:01–01:08].  Ms. Bradley testified as such out of the belief that the Firm had had her sign all relevant documents, and that the Schedules and SOFA to which the Trustee referred were in fact documents that she had signed at the meetings of creditors.  [*Id*. at 07:18–07:30]; [Tape Recording, Apr. 26, 2013 Hearing at 12:04:10–12:05:28 p.m.].  When the Trustee asked for clarification about whether she had signed the Amended Conversion Schedules and the Amended Conversion SOFA, Ms. Bradley, in turn, asked Carter if she had actually signed them, and he replied that he did not know.  [Tape Recording, Jan. 22, 2013 Meeting of Creditors at 01:42–01:53].  Ms. Bradley then informed the Trustee that the

only documents that she had signed were the documents that she signed at the meetings of creditors, and that she had not reviewed any Schedules or SOFA since the January 8, 2013 meeting of creditors.[9]  [*Id.* at 01:53–02:20].  Ms. Bradley, therefore, committed perjury by twice signing statements—at the January 8 and January 22, 2013 meetings of creditors—that she had personally reviewed and signed all Schedules and SOFA, as well as briefly orally testifying to the same on January 22.

49.    During the January 22, 2013 continued meeting of creditors, Ms. Bradley reiterated her desire and her husband's desire to remain in Chapter 13 and repay their creditors, rather than convert to Chapter 7.  [*Id.* at 11:37–11:58]; *see also* [Doc. 132 at 5, ¶ 16].

50.    At the continued meeting of creditors on January 22, 2013, Ms. Bradley also testified about her frustrations with the legal representation the Debtors received from the Firm and the continuing string of attorneys that had represented the Debtors.  After discovering that the Amended Conversion Schedules and the Amended Conversion SOFA had still not been corrected, Ms. Bradley explained to the Trustee:

> "For the record, this is ridiculous.  And it's not your fault, obviously.  I submitted everything to them before we went to court on the 8th, and then I resubmitted it when we, when I left here on the 8th, I resubmitted everything.  You know, I had to call three times about that stay for the vehicle.  Mr. Aduwa finally on the 17th, after I sent his paralegal, you know, an email that was a little bit rude, he finally, he tells me 'oh well we have until the 22nd to file the motion.'  So you're gonna wait until the last day when I told you on the 8th that this stuff needed to be done?  Like, what did I pay for?"

---

[9] The document that Ms. Bradley signed at both the January 8, 2013 meeting of creditors and the January 22, 2013 continued meeting of creditors is entitled "341(a) Meeting Questionnaire and Sworn Testimony" (the Questionnaire).  See *In re Jackson*, No. 06-36268, 2012 Bankr. LEXIS 3496, at *32–33 (Bankr. S.D. Tex. Jul. 27, 2012) for a discussion of this questionnaire.  The Questionnaire is a document that all of the Chapter 7 trustees in the Southern District of Texas use to consolidate all of the fundamental questions to debtors regarding the accuracy of documents filed with the court.  Among other things, it constitutes a sworn statement by a debtor that he or she has personally reviewed and signed all of the Schedules and the SOFA.

[Tape Recording, Jan. 22, 2013 Meeting of Creditors at 05:51–06:28].  When further

explaining to the Trustee the amounts that the Debtors paid for representation in their

Chapter 13, Ms. Bradley stated:

> We were completely mislead and misconstrued with [the Chapter 13] as
> well. . . . They told us that we need everything, you know, that was in a
> loan, we needed to file with the Trustee's office, go ahead and put it all
> together.  The truck, I was ahead on my truck notes.  Every month I was
> sending a minimum of $50.00 extra on the principal.  Uh, that January
> before we filed I had sent them double on the payment plus extra.  You
> know, and [the Firm's employees] were like, "Oh, no, don't worry about
> it, it has to be included, it needs to be included."  And then when I spoke
> to Mr. Aduwa because of this, you know, Chrysler sending in the motion
> that they want to repo the truck basically, you know and I told him, "Well,
> you, you even told us if the case were to be converted, as long as we were
> current before, we wouldn't have to pay, you know we wouldn't have to
> worry about that, just continue to make the regular payments."  And he
> said, "Well no, you know, the interest is gonna go up."
>
> "I understand that, but you didn't say that it's gonna cause us to look like
> we were behind and then have to, now your telling us that we have to pay
> $13,000.00 or we lose, we lose the truck.  You never told us that."
>
> "Well, you know, you were behind on the truck."
>
> "No I was not behind on the truck."
>
> And so he went through, "Oh, well then why did you file it in the 13, I
> don't understand, you shouldn't have done that."

[*Id.* at 08:02–09:17].  Finally, the Trustee inquired as to why Ms. Bradley had changed

attorneys so often, and she responded:

> Macey and Aleman has changed their attorneys.  I don't know what kind
> of conflict.  I have no idea.  They don't tell us, they just say "Oh, you have
> a new attorney now, you have a new attorney now." You know.

[*Id.* at 09:45–09:57].  The Trustee then interrupted to inquire as to who Macey and

Aleman was, and if it was a predecessor to the Firm.  [*Id.* at 09:57–10:04].  Carter

explained that the Firm was formerly Macey and Aleman, but that it was currently the

Macey Bankruptcy Firm.  [*Id.* at 10:05–10:33].  The U.S. Trustee's representative (Lucy

Davis) then inquired whether all of the former attorneys for the Debtors had worked for Macey and Aleman and Carter responded in the affirmative, and that he had worked with all of them at one point.  [*Id*. at 10:33–11:24].

51.     On January 22, 2013, the Firm filed another amended conversion Schedule I (the Second Amended Conversion Schedule I).  [Doc. No. 128].  The Second Amended Conversion Schedule I was filed with the Court at 2:49 p.m. central standard time [*Id.*]—almost two full hours after the continued meeting of creditors was scheduled to begin.

52.     Aduwa regularly sends Carter, the appearance attorney, to appear at meetings of creditors to represent debtors who are clients of the Firm.  [Doc. No. 170 at 6, ¶ 15]; [Tape Recording, Apr. 26, 2013 Hearing at 10:43:23–10:47:50 a.m.].  Aduwa and the Firm maintain that Carter is only dispatched to creditors' meetings and uncontested court hearings.  [Doc. No. 170 at 6, ¶ 15]; [Tape Recording, Apr. 26, 2013 Hearing at 10:43:23–10:47:50 a.m.].

53.     Aduwa did not adequately prepare Carter for the initial meeting of creditors held on January 8, 2013, or the continued meeting of creditors on January 22, 2013.  [Tape Recording, Apr. 26, 2013 Hearing at 10:37:30–10:38:56 a.m.; 10:48:15–10:48:59 a.m.].  Aduwa was out of the office for the two weeks prior to this initial meeting of creditors and sent Carter on his behalf so that he (i.e., Aduwa) could address the backlog of issues that had arisen in his absence.[10]  [*Id.* at 10:40:57–10:42:19 a.m.].  As a result, Carter was unprepared to handle the situation that arose when Ms. Bradley realized that the Amended Conversion Schedules and the Amended Conversion SOFA were incorrect.

---

[10] For reasons that are unclear to this Court, Aduwa apparently did not believe that the Debtors' case was a part of this backlog that required his attention.

54.    The Firm pays Carter $100.00 for each meeting of creditors he attends on behalf of the Firm.  [*Id.* at 10:46:16–10:46:51 a.m.].  Carter is also paid $75.00 for each courtroom appearance he makes in place of Aduwa.  [*Id.* at 10:46:51–10:47:28 a.m.].  Testimony at the April 26, 2013 hearing on the SCO indicates, and an examination of the relevant documents confirms, that the Firm did not properly disclose the Firm's payments to Carter under Bankruptcy Rule 2016.  [*Id.*]; *see also* [Doc. No. 1 at 35]; [Doc. No. 77].[11]

55.    The relationship between Carter and the Firm is longstanding.  Carter has appeared in the place of Firm attorneys for the last several years.  Though it is not clear exactly how long Carter has appeared on behalf of the Firm's attorneys, the Firm was already using Carter when Aduwa joined the Firm in 2010.  [Tape Recording, Apr. 26, 2013 Hearing at 10:47:28–10:47:50 a.m.].

56.    Carter also appeared on behalf of Aduwa at the continued meeting of creditors held on January 22, 2013, though it appears that this was a last-minute arrangement.  [Doc. No. 132-1 at 1]; [Doc. No. 170 at 7, ¶ 17].  Aduwa fell ill the day of this continued meeting and sent Carter so that there would be some representation on behalf of the Debtors.  [Doc. No. 170 at 7, ¶ 17]; [Tape Recording, Apr. 26, 2013 Hearing at 10:48:57–10:49:32

---

[11] Carter's employment as an appearance attorney violates the requirement of Bankruptcy Rule 2016(b) that "[*e*]*very* attorney for a debtor" must file a statement with the court disclosing whether that attorney has shared, or agreed to share, any compensation.  Fed. R. Bankr. P. 2016(b) (emphasis added).  Not only did Carter not file a disclosure statement as required, but Aduwa did not disclose in his own statement that the Firm would be sharing any compensation with Carter.  In fact, Aduwa's disclosure filed on January 4, 2013, explicitly stated that the Firm would not be sharing any fees.  [Doc. No. 121 at 31].  The use of Carter as an undisclosed appearance attorney not only violates Bankruptcy Rule 2016(b), but also violates the prohibition on fee sharing contained in 11 U.S.C. § 504(a).  The prohibition against compensation sharing does not apply to: (1) partners or associates *in* the same professional association, partnership, or corporation; (2) attorneys for petitioning creditors that join in a petition for an involuntary bankruptcy case; and (3) an attorney and an authentic public service attorney referral program.  11 U.S.C. §§ 504(b)–(c).  Courts interpret the first exception to § 504(a) very narrowly and only apply it to fee sharing between attorneys that are members of the same law firm.  *In re Ferguson*, 445 B.R. 744, 754 (Bankr. N.D. Tex. 2011).  The regular relationship between the Firm and Carter does not fit this exception, as Carter is neither a partner nor an associate at the Firm.  *See id.* at 750–56; [Finding of Fact No. 38(d)].

p.m.].  Aduwa did not notify the Debtors that Carter would be representing them at the continued meeting of creditors.  [Tape Recording, Apr. 26, 2013 Hearing at 10:37:30–10:38:56 a.m.].  Due to the last-minute arrangement, Carter was unprepared for this meeting.  [Doc. No. 170 at 7, ¶ 17].

57.  On January 29, 2013, Joseph Hill, the Chapter 7 Trustee in this case (the Trustee), filed a motion titled: "Trustee's Amended Motion to Set Show Cause Hearing to Require Nosa Aduwa and Macey Bankruptcy Law, PC to Appear and Show Cause Why they Should Not Be Required to Disgorge Fees Pursuant to 11 U.S.C. 526" (the Motion).  [Doc. No. 132].  The Motion made several serious allegations about the conduct of the Firm and the attorney-in-charge (i.e., Aduwa) responsible for representing the Debtors in this case. The Motion requested this Court to set a hearing requiring the Firm and Aduwa to appear and show cause why the Firm should not be required to disgorge fees pursuant to 11 U.S.C. § 526(c)(2)(A) and sanctioned pursuant to 11 U.S.C. § 105, including paying the Trustee's attorney's fees for having to prosecute the Motion.

58.  Following the filing of the Motion, the Firm returned the $524.00 that it had charged the Debtors for the Chapter 7 conversion (i.e., the $550.00 paid by Ms. Bradley less the $26.00 conversion fee).  [Doc. No. 170 at 15, ¶ 36]; *see also* [Tape Recording, Apr. 26, 2013 Hearing at 12:22:46–12:23:14 p.m.].

59.  The Firm has not returned to the Debtors any of the fees that the Firm collected prior to the Debtors' conversion.  [Tape Recording, Apr. 26, 2013 Hearing at 12:09:05–12:09:11 p.m.].  That is, the Firm has not returned any of the fees that it received from the Debtors relating to the prosecution of the Debtors' Chapter 13 case.

60.     On February 19, 2013, Aduwa and the Firm filed their response to the Motion (the Motion Response).  [Doc. No. 140].  Aduwa signed the Motion Response for both the Firm and himself.  The Motion Response admitted that "clearly inadvertent errors" were made in the representation of the Debtors, but asserted that no show cause hearing should be held, [*Id.* at 1, ¶ 1; 6, ¶ 38], and that all relief requested by the Trustee should be denied, [*Id.* at 7].  After considering the Motion and the Motion Response, the Court decided to schedule a hearing on the Motion for March 7, 2013.  The purpose of this hearing was to determine if this Court should issue a show cause order.

61.     On March 7, 2013, the Trustee appeared through his counsel, while the Firm appeared through Aduwa.  Aduwa also appeared on his own behalf.  The Trustee introduced exhibits and adduced testimony from one witness: Ms. Bradley; her husband and she are the Debtors in this case.  Ms. Bradley gave uncontroverted and credible testimony that proved up many of the allegations in the Motion and greatly concerned this Court.

62.     As a result of Ms. Bradley's testimony, this Court issued a Show Cause Order (the SCO) on March 15, 2013.  [Doc. No. 157].  The hearing on the SCO was set for April 26, 2013, and required Aduwa and the Firm's two name partners—Thomas G. Macey (Macey) and Jeffrey J. Aleman (Aleman)[12]—to appear and show cause why each of them, in their individual capacities, and the Firm "should not be sanctioned pursuant to 11 U.S.C. § 526 and other applicable law" for the following:

    a.     Filing the Schedules and SOFA with forged signatures of the Debtors;

---

[12] When this Court issued a show cause order in 2010, the name of the Firm was Macey and Aleman, LLP. Subsequently, the Firm changed its name to Macey Bankruptcy, P.C.  Nevertheless, because Aleman appeared in this Court on the show cause order from 2010, this Court believed that he needed to appear for the hearing on the SCO set for April 26, 2013, even though he is no longer a name partner at the Firm.

b.     Filing the Schedules and SOFA without an attorney from the Firm personally meeting with the Debtors to review the Schedules and SOFA for accuracy;

c.     Allowing a legal assistant to practice law;

d.     Neglecting to ensure that the attorney-in-charge (i.e., Aduwa) has face-to-face communications with the clients (i.e., the Debtors);

e.     Failing to prepare the clients for the meeting of creditors;

f.     Not appearing at the meeting of creditors to represent the clients;

g.     Sending an uninformed appearance attorney to the meeting of creditors to represent the clients;

h.     Misrepresenting to the Court in a Rule 2016 Disclosure [Doc. No. 77] the amount of money paid by the Debtors for prosecution of their Chapter 13 case; and

i.     Misrepresenting to the Court in a Rule 2016 Disclosure [Doc. No. 121] the amount of money paid by the Debtors for prosecution of the case after conversion to Chapter 7.

In addition to requiring Macey, Aleman, and Aduwa to appear and show cause why they should not be sanctioned, the SCO also required Gutierrez to appear and show cause why she should not be sanctioned for practicing law without a license.

63.     On April 22, 2013, the Firm filed a Response to the SCO (the SCO Response), [Doc. No. 166].  Unlike the Motion Response, the SCO Response was not filed by Aduwa, but rather by Tom Kirkendall (Kirkendall), a private attorney with offices in The Woodlands, Texas.  The Firm retained Kirkendall to represent it at the hearing on the SCO.  The SCO Response is well drafted and refreshing for its candor to the Court.  It concedes that the quality of the representation of the Debtors, at least for a certain period of time, was

unacceptable; it sets forth what steps the Firm has taken since receiving the SCO; and it argues that the substandard representation, while regrettable, was not done in bad faith. The SCO Response also lays out several remedial measures that the Firm has implemented since this Court issued the SCO.  The Firm returned the conversion fee to the Debtors, less the cost of filing, [*Id.* at 14–15, ¶ 36], paid the retainer of the Debtors' new counsel, [*Id.*], and paid the legal expenses incurred by the Trustee and the U.S. Trustee for the services their respective attorneys have rendered relating to the show cause hearings, [*Id.*].

64.    On April 26, 2013, the Court held a hearing on the SCO.  Kirkendall represented the Firm at the hearing; Aduwa represented himself; Gutierrez represented herself, *pro se*; the Trustee appeared through his counsel, Tim Wentworth; and the Office of the U.S. Trustee appeared through its counsel, Ellen Hickman.

65.    After listening to the April 26, 2013 testimony, reviewing exhibits, and hearing closing arguments, the Court took the SCO matter under advisement.

66.    Additionally, based on issues raised during the April 26, 2013 hearing, the Court became concerned that the Firm might be handling other cases improperly.  The Court directed Kirkendall to examine a random selection of currently pending case files at the Firm's Houston office.  [Tape Recording, Apr. 26, 2013 Hearing at 12:38:55–12:41:22 p.m.]. Specifically, Kirkendall was ordered to randomly select twenty files from the Firm's Houston office and examine them to determine whether there were "wet" signatures on all Schedules and Statements of Financial Affairs.  [*Id.*].

67.     Following the April 26, 2013 hearing, Kirkendall undertook the ordered examination and filed a report disclosing that he found three files with improper or incomplete "wet" signatures.  [Doc. No. 169].

68.     On May 23, 2013, this Court held a hearing regarding Kirkendall's report about the three files with improper or incomplete "wet" signatures.  Based upon Kirkendall's report and comments made at this hearing, the Court concluded that a review of all of the Firm's files at the Houston office was appropriate.  Accordingly, the Court ordered Kirkendall to either personally examine or supervise the examination of all files at the Firm's Houston office.  [Tape Recording, May 23, 2013 Hearing at 2:51:35–2:53:31 p.m.].

69.     At this hearing, Kirkendall advised the Court that the Firm had filed an amended response to the SCO [Doc. No. 170].  This updated response amended paragraphs 10 and 12 to reflect the corrected recollection of Gutierrez, who now recalled that Ms. Bradley did not, in fact, come to the Firm's office on December 17, 2012, but rather came to the office on December 18, 2012.  [Tape Recording, May 23, 2013 Hearing at 2:58:28–3:00:27 p.m.].

70.     After the May 23, 2013 hearing, Kirkendall undertook an examination of all bankruptcy case files at the Firm's Houston office.  Kirkendall reported his findings to this Court on June 18, 2013.  [Doc. No. 172].  Kirkendall's report indicates that there are a total of 192 active case files at the Firm's Houston office.  [*Id*.].  Of those, Kirkendall discovered that twelve (12) files either: (1) did not contain a full set of the debtor's "wet" signatures; or (2) lacked the required signatures altogether.  [*Id*.].

71.     In 2012, subsequent to the filing of the Debtors' case, the Firm merged its bankruptcy practice with the personal injury practice of Jacoby & Myers, L.L.P.  Every indication is

that the Firm continues to operate as it had before the merger, only under a new name,
Jacoby & Myers Bankruptcy, L.L.P.  [Tape Recording, Apr. 26, 2013 Hearing at
12:24:34–12:27:45 p.m.].  Clients were notified by email of the Firm's name change;
however, the filings with the State of Texas regarding this merger are not yet complete,
and the Firm still does business in Texas under its former name.  [*Id.*].

### III. CREDIBILITY OF WITNESSES

At the hearing on the SCO held on April 26, 2013, the following witnesses testified: (1)
Richard Gustafson (Gustafson), a partner at the Firm who has not handled the Debtors' case in
any way; (2) Aduwa, the attorney in charge of the Macey Firm's Houston office, and the attorney
who handled the Debtors' case from 2010 until they retained new counsel in March of this year;
(3) Gutierrez, a legal assistant in the Firm's Houston office who handled many aspects of the
Debtors' case; (4) Aleman, managing partner of the Firm; (5) Macey, managing partner and
founder of the Firm; and (6) Ms. Bradley, one of the Debtors in this case.  After listening to the
testimony, the Court makes the following observations and findings regarding the credibility of
these witnesses.

### A.      Richard Gustafson

Gustafson is a partner at the Firm.  [Tape Recording, Apr. 26, 2013 Hearing at 10:15:07–
10:15:14 a.m.].  He testified about the state of the Firm and its practice in the State of Texas,
specifically since 2010.  [*Id.* at 10:16:01–10:19:32 a.m.].  He testified that the Firm is in the
process of closing out its practice in Texas.  [*Id.*].  He testified that this is due to the general
decline in the cases coming into the Firm's Houston office.  [*Id.*].  Gustafson further testified
about the steps taken by the Firm to remedy the problems made apparent by the case at bar.  [*Id.*
at 10:25:42–10:26:10 a.m.]; *see also* [Doc. No. 166 at 15–16, ¶ 37]; [Doc. No. 170 at 16–17,

¶ 37].  Further testimony related to the use of "appearance attorneys" by the Firm, as well as the procedures currently in place to oversee the attorneys working in the Firm's various offices located throughout the United States.  [Tape Recording, Apr. 26, 2013 Hearing at 10:14:08–10:32:42 a.m.].  Gustafson's testimony about the Firm's use of appearance attorneys is that, "We don't like to use appearance counsel unless its necessary, usually the necessity would be because of a conflict of calendar or an illness or something like that."  [*Id.* at 10:21:06–10:21:17 a.m.].  This testimony conflicts with the email that Gutierrez sent to Ms. Bradley on January 23, 2013, which states that Aduwa "normally does not attend the 341 meetings" and that "Carter attends those as well as our court hearings."  [Trustee's Ex. A at 2].  This conflicting testimony underscores the Firm's failure to supervise the personnel at the Houston office as much, if not more, than it undermines Gustafson's credibility.

Gustafson also gave his assessment of the Debtors' case and Aduwa's handling of it as the attorney-in-charge.  [Tape Recording, Apr. 26, 2013 Hearing at 10:20:43–10:20:18 a.m.].  His responses seemed candid and generally sincere, as did his apology to both the Court and the Debtors about the improper handling of the Debtors' case.  Gustafson also provided some testimony regarding prior sanctions proceedings involving the Firm.  [*Id.* at 11:32:40–11:34:25 a.m.].  During this testimony, Gustafson seemed honest and forthright with the information he provided to the Court.

In sum, the Court finds that Gustafson is a credible witness.  He was willing to candidly discuss the failures of the Firm.  The Court also appreciates his knowledge of prior sanctions proceedings against the Firm.  Accordingly, the Court finds him to be, for the most part, a credible witness and gives more weight to his testimony than to the testimony of his fellow partners, Macey and Aleman.

**B.      Nosa Aduwa**

Aduwa is the Debtors' former lawyer and one of the subjects of the SCO.  Aduwa testified as to his actions both before and after the transgressions discussed herein took place. Aduwa was generally forthright with his admissions and willing to take responsibility for the various violations and errors that he made as attorney-in-charge of the Debtors' case.  For example, Aduwa admitted that he did not adequately prepare the appearance attorney (i.e., Carter) to represent the Debtors at their meeting of creditors.  [*Id*. at 10:37:30–10:38:56 a.m.]; [Finding of Fact No. 53].  He further admitted that he did not follow the Firm's internal policies for sending an appearance attorney to a proceeding in his place.  [Tape Recording, Apr. 26, 2013 Hearing at 10:37:30–10:38:56 a.m.].

However, Aduwa's credibility is damaged by the fact that there are contradictions between Ms. Bradley's testimony and the SCO Response filed with this Court.  For example:

1. The SCO Response claims that Ms. Bradley called the Firm on November 9, 2013, to state her desire to convert to Chapter 7, [Doc. No. 166 at 3, ¶ 7], whereas Ms. Bradley testified that she steadfastly preferred to remain in Chapter 13 and only made the decision to convert after Gutierrez advised her that it was the only option, [Tape Recording, Apr. 26, 2013 Hearing at 11:59:13–11:59:41 a.m.]; and

2. The SCO Response claims that Ms. Bradley visited the Firm's office on December 17, 2013, to pay the conversion fee and that Gutierrez completed the Notice of Conversion while Ms. Bradley waited, [Doc. No. 166 at 4, ¶ 12], whereas Ms. Bradley testified that she visited the office a day or two after the 17th and that Gutierrez did not prepare the Notice of Conversion while Ms. Bradley was present,

but rather that Ms. Bradley paid the conversion fee and then left, [Tape Recording, Apr. 26, 2013 Hearing at 12:00:40–12:02:32 p.m.].

Kirkendall, the private attorney retained by the Firm, filed the SCO Response; however, Aduwa worked closely with him in preparing the document. [*Id.* at 11:52:12–11:53:01 a.m.]. Further, Aduwa has repeatedly made representations to this Court, through submitting the documents electronically, that he had the original documents with "wet" signatures on file in his office when, in fact, he did not.[13]  [Doc. Nos. 121, 122, 123, 124]; [Finding of Fact Nos. 31, 32, 35, 36].  Finally, Aduwa did not personally appear at either meeting of creditors, and did not give the Debtors notice on either occasion that they would be represented at those meetings by Carter and not Aduwa himself.  [Finding of Fact Nos. 39, 55].  These contradictions and Aduwa's conduct call his credibility into question.  Accordingly, the Court finds Aduwa to be a somewhat, but not entirely, credible witness; and therefore gives only some weight to his testimony.

## C.     Aurelia Gutierrez

There are several inconsistencies in Gutierrez's testimony that call her credibility into question:

1. Gutierrez testified that Ms. Bradley came to the Firm's office on December 17, 2012—the final day to file a conversion—and reviewed the Notice of Conversion and paid the $550.00 fee.  [Tape Recording, Apr. 26, 2013 Hearing at 12:18:48–12:19:12 p.m.].  This testimony conflicts directly with the testimony of Ms. Bradley, who

---

[13] Aduwa's credibility is also called into question by the fact that there are a total of twelve (12) files at the Firm's Houston office containing either incomplete sets of, or missing, "wet" signatures, including the file for the case at bar.  [Finding of Fact No. 70].  Section III, part B, paragraph 4 for the Administrative Procedures for Electronic Filing requires attorneys filing documents electronically to retain the original, "wet" signed documents for five (5) years after the case is closed.  As the managing attorney for the Houston office, Aduwa is responsible for ensuring that the Firm's Houston files comply with this Rule.  Aduwa did not disclose any of these improprieties on the stand or in any pleading or brief in response to the SCO.

adamantly testified that she did not go to the Firm's office until a day or two after the 17th.  [*Id*. at 12:00:40–12:00:53 p.m.].  The receipt Gutierrez wrote Ms. Bradley upon payment of the conversion fee further contradicts Gutierrez's testimony.  The receipt is dated December 18, 2012.  [Doc. 132-2 at 2].

2.  Since the hearing on the SCO, Gutierrez has changed her story regarding the day Ms. Bradley came to the Firm's office.  Gutierrez now recalls that Ms. Bradley did come to the office on December 18, 2012, and not on December 17, 2012, as she testified during the hearing on the SCO.  [Doc. No. 170]; [Tape Recording, May 23, 2013 Hearing at 2:59:48–3:1:42 p.m.].  Given the electronic log software the Firm employs, and that Gutierrez testified that she reviewed all electronic logs and emails in the preparation of the SCO Response, [Tape Recording, Apr. 26, 2013 Hearing at 10:51:30–10:52:20 a.m.], the Court is troubled by the difficulties Gutierrez has with her recollection in this regard.

3.  When questioned by the Court regarding the files at the Firm's Houston office, Gutierrez testified that there were no files other than the one for the case at bar, that she was aware of, that did not contain proper signatures.  [*Id*. at 10:57:30–10:58:12 a.m.].  Further, she testified that all the cases in which she was involved had the proper "wet" signatures on the paperwork.  [*Id*. at 10:56:29–10:57:32 a.m.].  However, Kirkendall's examination of all of the Firm's case files at the Houston office revealed twelve (12) files that contain incomplete sets of "wet" signatures.  [Finding of Fact No. 70].  A number of these files contain documents that simply do not bear the required signatures of the debtor. [*Id*.].  At least two of these cases were filed after 2010 (ie., *after* Gutierrez began working for the Firm).  Because Gutierrez

is the only full time legal assistant in the Firm's Houston office, the Court has difficulty entertaining the notion that Gutierrez was simply unaware of these files. The evidence contradicts her proclamations that all of the files in the Firm's Houston office were complete and calls her credibility into question.

All in all, the Court finds that Gutierrez is not a particularly credible witness. Accordingly, the Court gives very little weight to her testimony.

## D.    Jeffrey Aleman

Aleman is a managing partner at the Firm.  [Tape Recording, Apr. 26, 2013 Hearing at 11:01:55–11:02:01 a.m.].  He testified about his past responsibilities within the Firm and about his own history with the Firm.  [*Id.* at 11:02:01–11:11:08 a.m.].  His testimony also outlined some of the changes that have occurred within the Firm, including its shift from a document preparation service to a full service law firm.[14]  [*Id.*].

The Court questions Aleman's credibility for the following reasons:

1.   Aleman was unable to provide any insight into prior sanctions proceedings against the Firm.  When asked if the Firm was ever previously subjected to sanctions, Aleman responded, "I believe we have, I don't know off the top of my head what instance that was or what case that was."  [*Id.* at 11:08:01–11:08:10 a.m.].  In fact, it was Kirkendall, the private lawyer representing the Firm, who disclosed certain prior

---

[14] Macey actually gave greater testimony than did Aleman about the Firm first being a document preparation service. According to Macey's testimony, when Macey first founded the Firm, it was solely a document preparation service.  [Tape Recording, Apr. 26, 2013 Hearing at 11:15:00–11:16:27 a.m.].  The Firm prepared bankruptcy documents for debtors for a fee of $200.00, but then did not provide any further representation or assistance to the debtors.  [*Id.*].  They were left to appear at court hearings and meetings of creditors *pro se*.  [*Id.*].  This business model enabled the Firm to service a large number of clients using one attorney, but only at the expense of the quality of representation to the debtors.  The U.S. Trustee in Chicago required the Firm to end this practice, and begin providing proper representation to debtors, which forced the Firm to increase staff.  [*Id.* at 11:16:04–11:16:27 a.m.; 11:23:03–11:23:57 a.m.].  Macey has therefore been aware, since the early days of the Firm, that it is unacceptable to trade the quality of representation provided to clients for an increased profit margin.

31

cases where sanctions were imposed against the Firm.   [*Id.* at 11:11:25–11:12:28 a.m.].   Given the nature of the hearing at which Aleman was testifying, the Court would have expected him to arrive more prepared to speak candidly about such matters.   Indeed, this is the third time the Firm has been the subject of a show cause hearing in front of *this* Court within the last three years.   *See* [*In re Salinas*, No. 06-33383 (Bankr. S.D. Tex.), Doc. No. 104]; [*In re Williams*, No. 08-31607 (Bankr. S.D. Tex), Doc. No. 115].   In fact, this Court sanctioned the Firm in *Salinas*, [*In re Salinas*, No. 06-33383, Doc. No. 119], and Aleman was present at the hearing on the motion to show cause in that case on December 20, 2010, [*In re Salinas,* No. 06-33383, Tape Recording, Dec. 20, 2010 Hearing at 8:35:58–8:36:53 a.m.].

2.   Furthermore, in at least one instance, Aleman *himself* was ordered to show cause why the Firm should not be sanctioned in another court.   In 2009, Bankruptcy Judge Russell Nelms, of the Northern District of Texas, ordered Aleman to appear in his court for a show cause hearing.   Subsequent to that hearing, Judge Nelms issued severe sanctions against the Firm, and announced his findings at a hearing at which Aleman appeared by telephone.[15]   [*In re Schoch*, No. 05-44801-RFN-13 (Bankr. N.D. Tex.), Nov. 20, 2009, Tr. 7:9–7:12].   The Court is disturbed that Aleman could not recall these proceedings, and his failure to recollect past sanctions against the Firm strongly calls his credibility into question.

---

[15] Courts may take judicial notice of findings entered in other cases where there is a common connection between some material elements of those cases—and, here, the common connection is the Firm and any sanctions imposed against it. *See United States v. Clay*, 581 F.2d 1190, 1192 (5th Cir. 1978); *see also In re TXCO Res., Inc.*, No. 09-51807, 2010 Bankr. LEXIS 5660, at *10 (Bankr. W.D. Tex. Jan. 27, 2010).

In sum, the Court does not find Aleman to be an overly credible witness and gives little weight to his testimony.

### E.      Thomas Macey

Macey is the founder of the Firm and a managing partner at the Firm today.  He testified about the origins of the Firm.  He admitted in his testimony that there were mistakes made in this case.  Macey did not, however, seem very apologetic.  He testified that he believes the Firm represents clients better than the vast majority of consumer bankruptcy firms, and he supported this belief with declarations of the hours that the Firm's attorneys work:

> I'd put forth that we do a better job than the vast, vast majority of bankruptcy practitioners out there.  I mean we are available six days a week; we're there ten hours a day; we're there, you know, seven hours on Saturdays.  We have more experience when it comes to consumer bankruptcy than I would say again, you know, 95%, 99%, cumulatively, of the, you know, bankruptcy practitioners out there. So, you know, do mistakes happen? You know, absolutely. Are we apologetic for that mistake?  Yes.  Was there ultimately harm to the debtor?  No. Did we make repercu . . . remunitions[16] [sic] to the Trustee? You know, yes. You know, we do our absolute best and, you know, we made a mistake, an honest mistake here, and that is not how we run our practice.

[Tape Recording, Apr. 26, 2013 Hearing at 11:18:49–11:19:52 a.m.].  Such hubris might otherwise be excusable were it not for his declaration that no harm was done to the Debtors in this case.  [*Id.* at 11:19:36–11:19:39 a.m.].  Such a statement is absurd in the current situation, where, as a result of the filing of the false Initial Conversion Schedules, Initial Conversion SOFA, Amended Conversion Schedules, and Amended Conversion SOFA, Ms. Bradley—in reliance upon the Firm's personnel completing these documents (specifically Aduwa and Gutierrez)—committed perjury at the meetings of creditors by representing under oath that she

---

[16] Presumably Macey meant "remunerations."

had indeed reviewed and signed those documents and that they were accurate.[17]  [Finding of Fact No. 48].  Moreover, the Debtors now find themselves in a Chapter 7 case, when they maintain that they could, and would have preferred to, have continued in their Chapter 13 case.  [Finding of Fact No. 49].  If Aduwa had actually taken the time to meet with the Debtors personally, he might have concluded that the Modified Plan in their Chapter 13 case could be further amended, making the conversion to Chapter 7 unnecessary.  Thus, Macey's conclusion that the Debtors were not harmed does not come within hailing distance of the truth.

Macey was aware of one of the recent cases where the Firm was sanctioned: *In re Love*, 461 B.R. 29 (Bankr. N.D. Ill. 2011).  However, Macey maintained—in the strongest terms—that the judge's ruling in that opinion was incorrect.  [Tape Recording, Apr. 26, 2013 Hearing at 11:29:15–11:30:55 a.m.].  Macey, however, did not articulate why the bankruptcy judge was incorrect.[18]  Macey *was*, at least, also aware of the sanctions imposed against the Firm by this Court in *Salinas*, but like his partner, Aleman, Macey could not testify regarding any details in *Salinas*.

In sum, the Court finds Macey to be a more credible witness than Aleman, as Aleman's testimony was more unbelievably vague, although this finding is by no means a ringing endorsement of Macey's credibility and reputation.  Overall, the Court finds Macey to be a somewhat credible witness.  The Court gives his testimony some, but not substantial, weight.

---

[17] See Ms. Bradley's testimony on page 36, below, about committing perjury at the January 22, 2013 meeting of creditors, and [Tape Recording, Apr. 26, 2013 Hearing at 12:11:42–12:13:45 p.m.].

[18] The undersigned judge has reviewed the *Love* opinion and completely agrees with its reasoning and ruling. Indeed, the Firm's representation of this debtor was clearly harmful, as the debtor, who was eligible to be in Chapter 7 from the outset, ended up making several months of payments in her Chapter 13 case before realizing that she never needed to be in Chapter 13.

F.     **Sarika Bradley**

Ms. Bradley testified about the process Aduwa, Gutierrez, and the Firm used both before and after converting her case from Chapter 13 to Chapter 7.  She testified that neither her husband nor she had any in-depth, face-to-face discussions with Aduwa about the conversion or explanations of the implications of converting their case to Chapter 7.  [*Id*. at 11:56:05 a.m.– 12:02:25 p.m.].  She further testified that neither of them were present when the Notice of Conversion was prepared or signed.  [*Id*.].  Further, she testified about the process by which the Firm prepared the Initial Conversion Schedules, the Initial Conversion SOFA, the Amended Conversion Schedules, and the Amended Conversion SOFA—and her discovery of the errors contained therein.  [*Id*. at 12:02:10–12:02:31 p.m.; 12:11:42–12:13:45 p.m.].

Ms. Bradley testified concerning discrepancies in assertions made by Aduwa, Gutierrez, and Macey concerning the Firm's representation of the Debtors.  She specifically cited an inconsistency between the email Gutierrez sent her on January 23, 2013—which states that Aduwa "normally does not attend the 341 meetings," [Trustee's Ex. A at 2], and that "Carter attends those as well as our court hearings," [*Id*.]—versus the testimony by Gustafson (a partner at the Firm) that, "We don't like to use appearance counsel unless its necessary, usually the necessity would be because of a conflict of calendar or an illness or something like that," [Tape Recording, Apr. 26, 2013 Hearing at 10:21:06–10:21:17 a.m.].

Ms. Bradley also disputed the assertions in the SCO Response that she had wanted to convert her case to Chapter 7 as early as November 9, 2012.  Paragraphs 7 and 8 of the SCO Response state that she desired to convert her case and had promised to contact Aduwa by the end of November 2012 about how to proceed.  She rebutted this claim, angrily stating, "I did not choose to go under a Chapter 7; I had called him on that day [November 9, 2012] to ask what the

options were. I never said 'I'm ready to go under a Chapter 7.'"  [Tape Recording, Apr. 26, 2013

Hearing at 11:56:04–11:57:06 a.m.]; *see also* [Doc. No. 166 at 3, ¶ 7].

Ms. Bradley took particular offense at the assertion that the Firm's mistakes did not harm

the Debtors.  When asked if she disagreed, she heatedly replied:

> He [Aduwa] put me in a position where I had committed perjury when the
> Chapter 7 Trustee, in front of the 341 creditor meeting, I was asked did I sign
> documents.  To my understanding of "documents" [they] were the ones I had
> signed; so that's what I'm thinking I'm saying yes to.  Then come to find out its
> stuff that my attorney was supposed to do, so for one I've committed perjury, for
> two I have kids.  Ok, I may not make $3,500.00 dollars per case but I do work
> hard, my husband works hard; we have a home, we have vehicles, and his form of
> employment is through a vehicle.  Because of the mistakes and because of the
> inaccuracies that [Gutierrez]—the legal assistant who should not have even been
> guiding me—told me, my husband no longer has that form of employment.  I'm
> still in jeopardy of losing my home with my second lien, so for you to say that no
> harm was done; I find that like a slap in my face.  You know, like I said, I don't
> make money like you do Mr. Macey, but that, . . . I was harmed.

[Tape Recording, Apr. 26, 2013 Hearing at 12:04:10–12:05:28 p.m.].  When then asked if the

return of her attorney's fees would compensate her for the harm she suffered, she angrily

continued:

> That would be a start, but it still doesn't . . . I was almost done with my Chapter
> 13 . . . it doesn't compensate for perjury . . . it doesn't compensate for the
> negligence that their attorneys. . . .  It's like kids who cheat on a test, "Oh, I'm
> sorry, I've never done it before."  You've done it before.  You know you've done
> it before, and it's not gonna be the last time; you just got caught this time, again.

[*Id*. at 12:05:59–12:06:27 p.m.].

Various documents of, and statements by, the Trustee corroborate Ms. Bradley's

testimony.  For example, Ms. Bradley testified that she did not visit the Firm's office on

December 17, 2012, but that her visit was at least a day later.  As discussed above, the date on

the receipt that Gutierrez wrote her when she made her payment supports Ms. Bradley's

testimony to this end.  [Finding of Fact No. 26].  Moreover, Ms. Bradley's stated desire to

remain in Chapter 13, rather than convert to Chapter 7, has remained constant throughout her case, [Finding of Fact Nos. 41, 49], and only after Gutierrez advised her that she should convert, did she (and her husband) reluctantly decide to do so.  Ms. Bradley testified that Gutierrez, not Aduwa, advised her that she needed to convert her case to Chapter 7:

> I contacted the attorney's office and they told me the only thing that would save me or any of my assets would be to file a Chapter 7 and that was actually told to me by Ray [i.e., Gutierrez], the legal assistant.  So that is when I made the decision, that is when we made the decision, to file a Chapter 7.

[Tape Recording, Apr. 26, 2013 Hearing at 11:59:13–11:59:29 a.m.].

Ms. Bradley's testimony, and her distress and anger, were genuine.  Ms. Bradley is not a sophisticated litigant, and she was justifiably very trusting of the Firm and its personnel.  Once she discovered, however, that the Firm's representation had harmed her husband and her, she rightfully became upset, and was fully capable of accurately recalling events and conversations. The Court finds her testimony to be credible and gives it significant weight.

## IV. CONCLUSIONS OF LAW

### A.    Jurisdiction, Venue, and Constitutional Authority

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157(a). This proceeding is core pursuant to 28 U.S.C. § 157(b)(2)(A) because the acts leading to the issuance of the SCO concerned the administration of the Debtors' bankruptcy case. Additionally, this particular dispute is a core proceeding pursuant to the general "catch-all" language of 28 U.S.C. § 157(b)(2).  *See Southmark Corp. v. Coopers & Lybrand* (*In re Southmark Corp.*), 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case.").  Here, the acts leading to the issuance of the SCO concern the conduct of attorneys who are counsel of record for the Debtors.  This Court

has the power to police the conduct of the attorneys who appear in this Court and to take action with respect to those attorneys who misbehave. *Chambers v. NASCO*, 501 U.S. 32 (1991); *Knight v. Luedtke* (*In re Yorkshire, LLC*), 540 F.3d 328, 332 (5th Cir. 2008). But for the existence of the Debtors' case, the misconduct described in this Opinion would not have occurred. These circumstances make this dispute a core proceeding. Venue is proper pursuant to 28 U.S.C. § 1408(1).

In the wake of the Supreme Court's ruling in *Stern v. Marshall*, this Court must also evaluate whether it has the constitutional authority to enter a final order regarding the issues raised in the SCO. *Stern v. Marshall*, 131 S. Ct. 2594 (2011). In *Stern*, the Supreme Court held that 28 U.S.C. § 157(b)(2)(C)—which authorizes bankruptcy judges to issue final judgments in counterclaims by a debtor's estate against entities filing claims against the estate—is an unconstitutional delegation of Article III authority to bankruptcy judges, at least when the counterclaim being adjudicated is based solely on state common law and does not affect the claims adjudication process. *Id.* at 2616.

The matter before the Court is not a counterclaim of the Debtors' estate based solely on state law. Rather, this matter arises from this Court's issuance of a show cause order to maintain the integrity of the bankruptcy process. This matter arises out of violations of various Code provisions, Bankruptcy Rules, and local Rules—specifically 11 U.S.C. § 329(a), Bankruptcy Rules 9011(b), 5005(a)(2), and 2016, and Local Bankruptcy Rules 1001-1 and 5005-1—by Aduwa, an officer of this Court, his employer (i.e., the Firm) and Gutierrez, an employee of the Firm. This Court has authority under Bankruptcy Rule 9011(c) to impose sanctions for violations of Rule 9011(b); and also under 11 U.S.C. § 105(a) and applicable case law to police the conduct of attorneys who appear in this Court and to impose sanctions on those attorneys

who misbehave. *Chambers*, 501 U.S. 32; *In re Yorkshire, LLC*, 540 F.3d at 332. In sum, the facts in the case at bar are wholly different from the facts in *Stern*.

For all of these reasons, the Court concludes that it has the constitutional authority to enter a final order imposing sanctions on Aduwa, Macey, Aleman, the Firm, and Gutierrez.

**B.    Aduwa Violated Federal Bankruptcy Rule 9011(b)**

Federal Rule of Bankruptcy Procedure 9011 has important implications for attorneys who electronically file documents with this Court, or, for that matter, any bankruptcy court. *In re Stomberg*, 487 B.R. at 806–07. Specifically, Bankruptcy Rule 9011(b) provides:

> (b) Representations to the Court. By Presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after and inquiry reasonable under the circumstances,—(1) it is not being presented for any improper purpose, . . . (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law; (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery . . .

Additionally, Local District Rule 11.1 requires that in each case, an attorney-in-charge be designated.[19] The attorney-in-charge is then responsible to the Court for the progression of the case and for the prosecution of the case. The attorney-in-charge, in signing pleadings filed with the court, must comply with Bankruptcy Rule 9011(b) and must also appear at all court proceedings, or send a fully informed attorney in his or her place. S.D. Tex. Local R. 11.2.

---

[19] The Local District Rules are incorporated into the Local Bankruptcy Rules by Local Bankruptcy Rule 1001-1(b).

1.  Aduwa Violated Bankruptcy Rule 9011(b)(3) by Failing to Obtain the Debtors' Signatures on the Notice of Conversion, the Initial Conversion Schedules, the Initial Conversion SOFA, the Amended Conversion Schedules, and the Amended Conversion SOFA, Which Would Have Served as the Debtors' Verification of the Accuracy of the Contents of these Documents

Related to Bankruptcy Rule 9011(b) is Bankruptcy Rule 1008, which requires that "[a]ll petitions, lists, schedules, statements, and amendments thereto shall be verified . . . ."  This means that debtors must sign the petition, Schedules, SOFA and any amendments to those documents as a means of not only authorizing the filing of those documents, but of verifying, under penalty of perjury, that they have reviewed the information contained therein and that it is true and correct to the best of their knowledge, information and belief.  *Briggs v. LaBarge* (*In re Phillips*), 317 B.R. 518, 523 (B.A.P. 8th Cir. 2004); *In re Wenk*, 296 B.R. 719, 727 (Bankr. E.D. Va. 2002).   Attorneys, correspondingly, have "an affirmative duty to conduct a reasonable inquiry into the facts set forth in a debtor's schedules [and] statement of financial affairs . . . before filing them."  *Lafayette v. Collins* (*In re Winthrow*), 405 B.R. 505, 512 (B.A.P. 1st Cir. 2009).  As a part of this reasonable inquiry, the attorney should sit down in person with his client and carefully review all Schedules, the SOFA, and any other documents to be filed with the court to ensure that all of the representations set forth therein are true and accurate.  *In re Stomberg*, 487 B.R. at 815; *In re Nguyen*, 447 B.R. 268, 282–83 (B.A.P. 9th Cir. 2011); [20] *In re Tran*, 427 B.R. 805, 809–10 (Bankr. N.D. Cal. 2010)**;** *see also In re Daw*, No. 09-00690-TLM, 2011 WL 231362, at *6 n. 14 (Bankr. D. Idaho Jan. 24, 2011).

---

[20] In *Nguyen*, the bankruptcy court found that the attorney's "cavalier attitude toward the schedules was contagious; it was transmitted first to [the attorney's] staff and then from them to the debtors themselves."  447 B.R. at 282-83. The Ninth Circuit Bankruptcy Appellate Panel agreed and stated, "we agree with the bankruptcy court that one hour is below the amount of time competent counsel generally spend with their clients.  [The attorney] had chosen to be an attorney and must accept the duties and responsibilities associated with the position."  *Id.*

The verification requirement under Bankruptcy Rule 1008 relates to Bankruptcy Rule 9011(b) because, by failing to obtain the debtor's verification as to the accuracy of the documents he files, an attorney falsely represents to the court that "the allegations and other factual contentions have evidentiary support."  Fed. R. Bankr. P. 9011(b)(3); *In re Josephson*, No. 04-60004-13, 2008 WL 113861, at *6 (Bankr. D. Mont. Jan. 9, 2008); *see also In re Phillips*, 317 B.R. at 524 ("[T]he petition [the attorney] filed did not have the debtor's original signature and therefore lacked a verification of the facts.  With no verification, the factual contentions have no evidentiary support and thus the petition violates Bankruptcy Rule 9011(b)(3).").

In the case at bar, Aduwa did not personally meet with either of the Debtors to verify their desire to convert their case from Chapter 13 to Chapter 7 prior to Aduwa's filing of the Notice of Conversion on December 17, 2012.  [Finding of Fact No. 25(d)].  Further, Aduwa never met with either of the Debtors before instructing Gutierrez to file the Initial Conversion Schedules and the Initial Conversion SOFA on January 4, 2013, [Finding of Fact No. 32(a)], or the Amended Conversion Schedules and the Amended Conversion SOFA on January 7, 2013, [Finding of Fact No. 35(a)].  Aduwa attributes these failures to the backlog of cases that piled up during the two weeks that he was out of office at the end of 2012.  [Finding of Fact No. 53].  While this Court realizes that even attorneys need, and are entitled to, a vacation, absence from the office or a busy schedule is no excuse for failing to fulfill a fundamental duty owed to the client and the Court.  Regardless of the circumstances, *no* changes are to be made to Schedules or a SOFA without the debtor expressly signing off.  *In re Stomberg*, 487 B.R. at 816.  Not only did this not happen here, but Aduwa is directly responsible for this failure.

Aduwa knowingly and repeatedly allowed the filing of documents for which he did not obtain—and never has obtained—the Debtors' authorization, their "wet" signatures, or their

verification of the accuracy of the facts within.  [Finding of Fact Nos. 25(a), 32(b), 35(b)].

Indeed, had Aduwa obtained the Debtors' signatures, he would have satisfied the requirements

for both authorization and verification.  *See In re Stomberg*, 487 B.R. at 807 (quoting *In re

Phillips*, 317 B.R. at 523).  Here, however, the Debtors never verified the accuracy of the

information contained in the Initial Conversion Schedules, the Initial Conversion SOFA, the

Amended Conversion Schedules, or the Amended Conversion SOFA.  [Finding of Fact Nos.

32(a), 35(a)].  In fact, Aduwa directed Gutierrez to prepare and file these documents without any

input from the Debtors.  [Finding of Fact Nos. 32, 35].  Further, the Debtors never even

authorized Aduwa to file the Amended Conversion Schedules and the Amended Conversion

SOFA.  [Finding of Fact No. 35(c)].  Obtaining the Debtors' signatures would have satisfied the

requirements for both authorization and verification necessary before filing documents on their

behalf.  *See In re Stomberg*, 487 B.R. at 807 (quoting *In re Phillips*, 317 B.R. at 523).

Additionally, this Court reaffirms its agreement with the court in *Phillips* that there are no

circumstances that would ever justify an attorney filing a petition, any Schedule, or a SOFA

without first obtaining the debtor's signature, "regardless of how urgent the need may appear to

be." *In re Phillips*, 317 B.R. at 521 (refusing to accept attorney's excuse that filing petition

without first obtaining the debtor's signature was necessary to prevent a foreclosure sale of the

debtor's home).  Therefore, in the case at bar, it is immaterial that the deadline for filing the

Initial Conversion Schedules and the Initial Conversion SOFA was fast approaching or already

had passed.  [Finding of Fact No. 28].  No circumstances excuse Aduwa from obtaining the

Debtors' "wet" signatures on—and their authorization for filing—the Initial Conversion

Schedules or the Initial Conversion SOFA.  Without the Debtors' signatures to verify that the

information on the Notice of Conversion, the Initial Conversion Schedules, the Initial

Conversion SOFA, the Amended Conversion Schedules, and the Amended Conversion SOFA (the Defective Pleadings) was correct, "the factual contentions have no evidentiary support." *In re Phillips*, 317 B.R. at 524.  By directing Gutierrez—the assistant whom he supervises—to file the Notice of Conversion on December 17, 2013, the Initial Conversion Schedules and the Initial Conversion SOFA on January 4, and the Amended Conversion Schedules and the Amended Conversion SOFA January 7, 2013, without the Debtors' signatures, Aduwa violated Bankruptcy Rule 9011(b)(3).

> 2.  Aduwa Violated Bankruptcy Rule 9011(b)(1) and (2) by Instructing Gutierrez to Forge the Debtors' Electronic Signatures on the Defective Pleadings

As this Court has also made clear in *Stomberg*, electronically filing a document that purports to have the debtor's signature but which was not, in fact, signed by the debtor is no different than physically forging the debtor's signature on a paper document.  *In re Stomberg*, 478 B.R. at 808 (citing *In re Wenk*, 296 B.R. at 725).  Indeed, multiple courts have found that "electronically filing a document bearing an electronic signature that was not actually or validly signed" constitutes a forgery amounting to a Rule 9011 violation.  *See In re Phillips*, 317 B.R. at 523–24 (upholding sanctions awarded where debtor's counsel violated Bankruptcy Rule 9011(b) by forging debtor's electronic signature on bankruptcy petition); *see also In re Flowers*, No. 12-40290-CEC, 2012 WL 987298, at *7 (Bankr. E.D.N.Y. Mar. 22, 2012) (finding that an attorney violated Rule 9011(b) by forging the electronic signature of debtor's counsel on bankruptcy petitions and other documents); *In re Josephson*, 2008 WL 113861, at *7 (granting trustee's request for sanctions where counsel violated 9011(b) by forging debtors' electronic signatures on addendum to Chapter 13 plan); *In re Alvarado*, 363 B.R. 484, 492 (Bankr. E.D. Va. 2007) (finding that sanctions were appropriate for attorney who forged debtor's electronic signature on

bankruptcy petition, thereby violating Rule 9011(b)); *In re Wenk*, 296 B.R. at 728 (finding that counsel who forged debtor's electronic signature on petition violated Bankruptcy Rule 9011(b)).

Here, Aduwa allowed—and indeed, instructed—Gutierrez to electronically file the Defective Pleadings representing that the Debtors had signed these documents with an "/s/", when in fact they had not.  [Finding of Fact Nos. 31, 34].  By authorizing the filing of the Defective Pleadings with forged electronic signatures, Aduwa violated Bankruptcy Rule 9011(b); he simply could not have believed that filing these documents with forged signatures was proper or warranted under existing law or a good faith argument. *See* Fed. R. Bankr. P. 9011(b)(1), (2).

### 3.  Sanctions are Appropriate Under Rule 9011(c) for Violations of Rule 9011(b)

An attorney who violates Bankruptcy Rule 9011(b) may be sanctioned pursuant to Bankruptcy Rule 9011(c).  *See Triad Financial Corp. v. Peake* (*In re Nair*), 202 F. App'x 765, 766 (5th Cir. 2006) (reviewing the bankruptcy court's imposition of sanctions under Bankruptcy Rule 9011(c) for a 9011(b) violation and finding that the bankruptcy court did not abuse its discretion); *In re Flowers*, 2012 WL 987298, at *7.  Section (c) provides that "if, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction upon the attorneys, law firms, or parties that violated subsection (b) or are responsible for the violation." Fed. R. Bankr. P. 9011(c).  Any party may file a motion for sanctions under Bankruptcy Rule 9011(c), or pursuant to Bankruptcy Rule 9011(c)(1)(B), "on its own initiative, the court may enter an order describing the specific conduct that appears to violate subdivision (b) and directing an attorney . . . to show cause why it has not violated subsection (b) with respect thereto." Fed. R. Bankr. P. 9011(c)(1)(B).

In this case, the Chapter 7 Trustee filed the Motion.  [Finding of Fact No. 57].  This Court, acting on the information in the Motion and on the basis of the March 7, 2013 hearing on the Motion, issued the SCO on March 15, 2013.  [Finding of Fact No. 62].  The SCO required Aduwa, Macey, Aleman, the Firm, and Gutierrez to show cause why they should not be sanctioned for the following: (1) filing Schedules and SOFA with forged signatures; (2) filing Schedules and SOFA without an attorney from the Firm personally meeting with the Debtors to review these documents for their accuracy; (3) allowing Gutierrez, a legal assistant, to practice law; (4) failing to have face-to-face communications with the Debtors by the attorney-in-charge of the file; (5) failing to prepare the Debtors for the meeting of creditors; (6) not appearing at the meeting of the creditors to represent the Debtors; (7) sending Carter, an uninformed appearance attorney, to the meeting of the creditors to represent the Debtors; (8) misrepresenting to the Court in a Rule 2016 Disclosure—[Doc. No. 77]—the amount of money paid by the Debtors for prosecution of the Chapter 13 case; and (9) misrepresenting to the Court in a Rule 2016 Disclosure—[Doc. No. 121]—the amount of money paid by the Debtors for prosecution of the case after conversion to Chapter 7.  [Finding of Fact No. 62].  Aduwa was given ample opportunity to respond to these allegations by adducing testimony and introducing exhibits in the hearings that were held on the Motion and the SCO, as well as by filing any necessary responses. As set forth above, this Court has concluded that the allegations asserted in the SCO are true, and Aduwa has failed to demonstrate that he should not be sanctioned for this conduct.  Thus, as Aduwa's conduct violated Bankruptcy Rule 9011(b); and, as he had notice and ample opportunity to respond, sanctions are appropriate under Bankruptcy Rule 9011(c).  The form and extent of these sanctions will be discussed subsequently in a separate section of this Opinion.

**C.      Aduwa Violated Bankruptcy Rule 5005(a)(2) and Applicable Local Bankruptcy Rules for Electronically Filing Documents with the Court**

Bankruptcy Rule 5005(a)(2) authorizes electronic filing and provides that:

A court may by local rule permit or require documents to be filed, signed or verified by electronic means that are consistent with technical standards, if any that the Judicial Conference of the United States established.  A local rule may require filing by electronic means only if reasonable exceptions are allowed.  A document filed by electronic means in compliance with a local rule constitutes a written paper for the purpose of applying these rules, the Federal Rules of Civil Procedure made applicable by these rules, and § 107 of the Code.

Fed. R. Bankr. P. 5005(a)(2).

In the Southern District of Texas, the relevant Local Bankruptcy Rules, which implement electronic filing, are 5005-1 and 1001-1.  Local Bankruptcy Rule 5005-1 governs the "Filing of Papers" and states, in pertinent part: "The Texas statewide procedures for electronic filing are adopted by this court and are published on this Court's website," and "Except as expressly provided or unless permitted by the presiding Judge, the Court requires documents being filed to be submitted, signed or verified by electronic means that comply with the procedure established by the Court."  Local Bankruptcy Rule 1001-1(b) provides: "In addition to these rules . . . the Administrative Procedures for CM/ECF . . . govern practice in the bankruptcy court."  Thus, these Local Bankruptcy Rules, when taken together, require compliance with "procedures established by the court"—specifically, "the Administrative Procedures for CM/ECF."  S.D. Tex. Local R. Bankr. P. 1001-1(b), 5005-1(b).

The Administrative Procedures for Electronic Filing, which the Local Bankruptcy Rules reference, control electronic filings in this Court.  Section III of the Administrative Procedures for Electronic Filing, entitled "Electronic Filing and Service of Documents," part B, paragraph 1 spells out signature requirements: "A document filed by electronic means shall either (1) contain a scanned image of any manual signature or an electronic signature affixed thereto; or (2) display

46

an '/s/' with the name typed in the location the signature would otherwise appear."  With respect to this particular requirement, it is clear that Aduwa complied: the documents filed on December 17, 2012, January 4, 2013, and January 7, 2013, do, indeed, contain an electronic signature "/s/" next to both Aduwa's name and the Debtors' names.  [Finding of Facts Nos. 25, 31, 34].  Aduwa did not, however, comply with section III, part B, paragraph 3 of the Administrative Procedures for Electronic Filing, which states:

> Within five (5) business days of the filing by electronic means of a bankruptcy petition, list, schedule, or statement that requires verification or an unsworn declaration under Fed. R. Bankr. P. 1008, the Electronic Filer shall tender to the court in paper format the appropriate "Declaration for Electronic Filing" substantially conforming either to Exhibit 'B-1,' 'B-2,' or 'B-3,'[21] which has been executed by any individual debtor or by the authorized representative of any corporate or partnership debtor.  Such Declaration shall be thereafter maintained by the Clerk of the Authorizing Court in paper format.

Aduwa never obtained the Debtors' signatures on the Declaration for Electronic Filing, nor did he tender this document to the Court.  Therefore, Aduwa failed to comply with paragraph 3.

Aduwa also violated section III, part B, paragraph 4 of the Administrative Procedures for Electronic Filing.  This paragraph, entitled "Retention of Documents with Third-Party Signatures," sets forth:

> Except as otherwise set forth in this Appendix, or as otherwise ordered by the Authorizing Court, documents which contain the original signature of any party other than the Electronic Filer, other than a Declaration for Electronic Filing as referenced above, shall be retained by the Electronic Filer for a period of not less than five (5) years after the case of adversary proceeding is closed, and upon request, such original document must be provided to the court of other parties for review.

---

[21] Exhibits B-1, B-2, and B-3 of the Administrative Procedures for Electronic Filing are examples of Declarations for Electronic Filing for use in three separate situations: (1) when filing the Petition and all Schedules/Statements simultaneously; (2) when filing a "Bare-Bones" Petition, Matrix, and large creditor list; and (3) when filing Schedules/Statements subsequent to the Petition date or amendments of the Petition, Matrix, Schedules, or Statements.

Because Aduwa never obtained the Debtors' "wet" signatures on the Notice of Conversion, filed on December 17, 2012, or on the Initial Conversion Schedules and the Initial Conversion SOFA filed on January 4, 2013, or on the Amended Conversion Schedules and the Amended Conversion SOFA filed on January 7, 2013, he did not, *and could not*, comply with paragraph 4 of part B.

Aduwa's failure to comply with paragraphs 3 and 4 of section III, part B of the Administrative Procedures for Electronic Filing means that he has never been in compliance with "the Administrative Procedures for CM/ECF"; and, in turn, Aduwa has never been in compliance with the "procedure established by the Court" for documents being filed by electronic means. S.D. Tex. Local Bankr. R. 1001-1(b), 5005-1(b). Thus, Aduwa has violated the specific Local Bankruptcy Rules governing electronic filing of documents. Further, because he violated the above-referenced Local Bankruptcy Rules, Aduwa also violated Bankruptcy Rule 5005(a)(2), which requires that documents be filed in accordance with local rules. Fed. R. Bankr. P. 5005(a)(2). Thus, sanctions are appropriate, and the form and extent of these sanctions will be subsequently discussed in this Opinion.

## D.  Aduwa Violated Guidelines for Professional Conduct A, B & D of Appendix D of the Local District Rules[22]

All practicing attorneys owe a fundamental duty of professional responsibility to their clients, the judiciary, opposing counsel, and the administration of justice. *See* S.D. Tex. Local R., Appendix D. Guidelines for Professional Conduct. These duties, which are articulated in the Guidelines for Professional Conduct, encompass three areas relevant to the circumstances at

---

[22] In 2001, the District Judges of the Southern District of Texas voted to adopt these Guidelines for Professional Conduct to be observed by all attorneys appearing before any district judge, bankruptcy judge, or magistrate judge presiding in the Southern District of Texas. *General Order 2001-7.* The guidelines are derived from the decision rendered in *Dondi Properties Corp. v. Commerce Savings and Loan Ass'n*, 121 F.R.D. 284 (N.D. Tex. 1988).

hand.  First, Guideline A requires that attorneys remain conscious of the broader duties owed to the judicial system in fulfilling their primary duties to their clients.   Second, Guideline B provides that lawyers owe the duties of candor, diligence and utmost respect to the judiciary. Finally, Guideline D states that lawyers owe fundamental duties of personal dignity and professional integrity to the administration of justice.  Aduwa's conduct, including (1) his failure to meet face-to-face with his clients (i.e., the Debtors) before preparing the Defective Pleadings; (2) his filing of the Defective Pleadings (through instructions to his assistant, Gutierrez) with forged electronic signatures [Finding of Fact Nos. 25, 31, 34]; and (3) his failure to disclose to this Court that he had not obtained and maintained possession of the Debtors' original "wet" signatures, violated these professional standards.[23]

1.  Aduwa's Violations of Guideline A of the Guidelines for Professional Conduct

Guideline A provides that "[i]n fulfilling his or her primary duty to the client, a lawyer must be ever conscious of the broader duty to the judicial system that serves both the attorney and the client."  Aduwa breached the duties he owed to his clients (i.e., the Debtors) by failing to meet with them in person to review the Defective Pleadings prior to filing these documents.  He also breached his duties to his clients and to the legal system when he allowed his legal assistant, Gutierrez, to handle aspects of the Debtors' case.  Specifically, these were areas in which he, as

---

[23] Neither Aduwa nor Gutierrez was initially forthcoming about these violations of professional ethics and standards. Though Aduwa did eventually take responsibility for his actions, he did not do so until the "cat was out of the bag" after the January 8, 2013 meeting of creditors, when Ms. Bradley discovered the numerous inconsistencies in the Amended Conversion Schedules and the Amended Conversion SOFA.  There is no indication that Aduwa would have come forward voluntarily, and the Court is concerned that the errors might never have been remedied save for Ms. Bradley's attentiveness in reviewing the Amended Conversion Schedules and the Amended Conversion SOFA at the meeting of creditors as well as her willingness to admit that she had committed perjury at the meeting of creditors.  It is no mean thing to admit to having committed perjury.  The fact that Aduwa knowingly directed Gutierrez to file the forged and incorrect Initial Conversion Schedules, the Initial Conversion SOFA, the Amended Conversion Schedules, and the Amended Conversion SOFA—and thereby put Ms. Bradley in harm's way for purposes of testifying at the meeting of creditors—constitutes bad-faith on Aduwa's part.

the Debtors' attorney, should have been personally involved.  For instance, Gutierrez prepared and filed the Notice of Conversion and the Amended Conversion Schedules, which Aduwa never reviewed.[24]  [Finding of Fact Nos. 25(c), 35(a), 36].  Finally, by sending an appearance attorney (i.e., Carter) to represent the Debtors at the meetings of creditors on January 8, and January 22, 2013, Aduwa further breached his duty.[25]

The Defective Pleadings were, at least initially, filled out entirely by Aduwa's legal assistant, Gutierrez.  [Finding of Fact Nos. 25, 30, 33].  Gutierrez is not a licensed attorney and should not have been preparing legal documents—particularly those to be signed under oath by the Debtors—without direct oversight from Aduwa.  Aduwa needed to review her drafts of the Defective Pleadings prior to those documents being filed.

Gutierrez—at Aduwa's direction—was improperly engaged in the practice of law by (a) giving legal advice to the Debtors about the necessity of converting their case to Chapter 7 to prevent the Chapter 13 case from being dismissed [Tape Recording, Apr. 26, 2013 Hearing at 11:58:19–11:59:39 a.m.]; and (b) unilaterally preparing and filing the Notice of Conversion, Initial Conversion Schedules, Initial Conversion SOFA, Amended Conversion Schedules, and Amended Conversion SOFA with this Court.

This Court recognizes the fundamental role that legal assistants play in assisting bankruptcy attorneys, particularly by collecting financial information from debtors, but there is an inherent difference between a legal assistant and a bankruptcy attorney.  Bankruptcy attorneys

---

[24] The Court finds that Aduwa never reviewed the Amended Conversion Schedules based upon the inaccuracies contained therein.  [Finding of Fact No. 36].

[25] Aduwa's breaches in this regard are threefold: (1) Aduwa had a duty to prepare Carter for the meetings of creditors; (2) Aduwa had a duty to disclose to the Debtors his proposed use of Carter and alert them that Carter would be representing them at both of their meetings of creditors; and (3) Aduwa needed to obtain approval from the Debtors for this approach.  Aduwa failed to fulfill any of these duties.

aid their clients by using their expertise in bankruptcy law to give legal advice.  On the other hand, legal assistants may *not* counsel, warn, or ensure a debtor's compliance with bankruptcy law.  *In re Stomberg*, 487 B.R. at 812–13; *see In re Perkins*, 213 B.R. 818, 820–21 (Bankr. E.D. Mich. 1997) (listing twelve (12) activities that constitute the practice of law, and sanctioning a firm that allowed legal assistants to advise debtors on a variety of bankruptcy related issues, including when to file cases, which Chapter to file under, and the filling out of Schedules).  *In re Gutierrez*, 248 B.R. 287, 295 (Bankr. W.D. Tex. 2000) ("[G]iving advice regarding bankruptcy matters of necessity constitutes the practice of law.").  Further, a legal assistant cannot be utilized as a stand-in for an absent attorney, and may not prepare and file documents which are un-reviewed by an attorney; rather, legal assistants are charged with mere transposition of a debtor's information onto the Schedules and Statement of Financial Affairs for review by the attorney.  *In re Stomberg*, 487 B.R. at 812.

Aduwa further breached the duties he owed to the Debtors and the Court by sending an unprepared appearance attorney, Carter, to the January 8, and January 22, 2013 creditors' meetings.  [Finding of Fact Nos. 38, 53].  There are a variety of inherent problems that arise when an appearance attorney is utilized, including the lack of notice debtors have as to who will represent them at any given proceeding.  *See In re Bernhardt*, No. 06-10626 MER, 2012 WL 646150, at *5 (Bankr. D. Colo. Feb. 28, 2012).  In this case, the Debtors not only had no notice that Carter was to represent them at their meeting of creditors, but Aduwa did not prepare Carter properly.[26]  [*Id*.].  Carter was unprepared to advise Ms. Bradley when she discovered the

---

[26] Local District Rule 11.2 expressly states that "the [attorney-in-charge] shall attend all court proceedings or *send a fully informed attorney* with authority to bind the client." (emphasis added).

inaccuracies in the Amended Conversion Schedules and the Amended Conversion SOFA. Sending an ill-prepared attorney in one's place for any reason is unwarranted.

Not only did Aduwa send Carter unprepared to the January 8, 2013 creditors' meeting; he also sent him unprepared to the continued creditors' meeting held on January 22, 2013. [Finding of Fact Nos. 38, 53]. The January 22 meeting was held because of the inaccuracies Ms. Bradley discovered in the Amended Conversion Schedules and the Amended Conversion SOFA during the January 8 meeting. Aduwa claims that he was ill on January 22, 2013; however, given the circumstances, this is no excuse for once again sending an unprepared appearance attorney to represent the Debtors. Given the seriousness of the incorrect Amended Conversion Schedules and the Amended Conversion SOFA, Aduwa should have considered the continued creditors' meeting an extreme priority, deserving of his utmost attention. Instead of simply deciding to dispatch an unprepared appearance attorney when he fell ill, Aduwa should have filed a very short motion for continuance and called the Trustee to alert him to the situation. An attorney-in-charge, sending an unprepared appearance attorney rather than appearing himself at a meeting of creditors, or any hearing, fails in his duty to both the client and the judicial system.

In sum, Aduwa violated Guideline A of the Guidelines for Professional Conduct.

2. Aduwa's Violations of Guideline B of the Guidelines for Professional Conduct

Guideline B provides that "[a] lawyer owes, to the judiciary, candor, diligence and utmost respect." By falsely representing that the Debtors had signed the Defective Pleadings, Aduwa showed that he was not diligent in his work, and was incredibly disrespectful of the judiciary and the bankruptcy process. Further, Aduwa violated his duty of candor by not informing the Court that he did not have the Debtors' "wet" signatures on each of these same five documents.

52

As attorney-in-charge for the Debtors, Aduwa is an officer of this Court and is bound by fiduciary standards.  *See ICM Notes, Ltd. v. Andrews Kurth, LLP*, 278 B.R. 117, 123 (Bankr. S.D. Tex. 2002) (citing *Brown v. Gerdes*, 321 U.S. 178, 182 (1944)); *see also In re Alvarado*, 363 B.R. at 489–90 ("As officers of the court, attorneys have a special responsibility for upholding the quality of justice within the judicial process.").   Though he admitted his misconduct at the hearing on the SCO, *see* [Tape Recording, Apr. 26, 2013 Hearing at 10:35:21– 10:43:08 a.m.], Aduwa did not admit his mistakes until *after* the Trustee brought the possibility of impropriety to the Court's attention.  Though he knew he did not have the Debtors' "wet" signatures, Aduwa remained silent. By staying silent under these circumstances, Aduwa showed an utter lack of candor and respect.

Aduwa also showed a lack of diligence and respect to the Court by sending an unprepared appearance attorney (i.e., Carter) to represent the Debtors at the meetings of creditors held on January 8 and January 22, 2013.[27]   As discussed above, appearance attorneys pose several problems for the courts as well as for debtors.  Appearance attorneys can hinder the swift dispatch of a case, and the lack of a formal association raises questions about the ability and authority of appearance attorneys to speak for debtors.  *See In re Jacobson*, 402 B.R. 359, 365 (Bankr. W.D. Wash. 2009) (discussing the inherent problems that appearance attorneys pose to judicial economy and equitable outcomes for debtors).  Such difficulties are exacerbated when,

---

[27] The Court recognizes that Aduwa was unexpectedly ill at the time of the January 22, 2013 continued meeting and does not find that he is at fault for such a circumstance.  However, the Court does find that Aduwa dealt with the situation incorrectly.  Rather than send an unprepared appearance attorney (i.e., Carter) to the meeting of creditors, Aduwa should have filed a motion for continuance and notified the Trustee of the situation.  Sudden illnesses or other emergencies happen to attorneys, the same as anyone else, but they must be dealt with appropriately.  It is unacceptable to allow one's clients to suffer from the quality of their representation because of an attorney's illness. Aduwa should have filed a very short motion to continue the meeting of creditors on the grounds that he was too ill to attend the meeting himself and represent the Debtors.  Indeed, given that the initial meeting of creditors held on January 8 revealed inaccuracies in the Amended Conversion Schedules and the Amended Conversion SOFA, Aduwa should have known that he, not Carter, needed to represent the Debtors at the continued meeting of creditors.

as here, an attorney-in-charge (i.e., Aduwa) completely fails to prepare his appearance attorney (i.e., Carter) for the meeting he will attend to represent the Debtors.  This can result—and did in the case at bar—in needless continuances of meetings and lost time in hearings while an unprepared appearance attorney comes up to speed with the situation.  Either way, sending an appearance attorney shows a great lack of respect for the Court's time.  Accordingly, Aduwa breached Guideline B by failing to treat the Court with candor and respect.

3.  Aduwa's Violations of Guideline D of the Guidelines for Professional Conduct

Finally, Guideline D provides that "[a] lawyer unquestionably owes, to the administration of justice, the fundamental duties of personal dignity and professional integrity."  Dignity[28] and integrity[29] are broad ideals, but both reflect the seriousness and moral esteem that an attorney must show to his client, the judicial system and other parties.  Aduwa breached Guideline D in at least the following respects: (1) he filed the Defective Pleadings without obtaining the Debtors' signatures, [Finding of Fact Nos. 25(a), 32(b), 35(b)]; (2) he allowed his legal assistant (i.e., Gutierrez) to forge the Debtors' original signatures on the Defective Pleadings, [Finding of Fact Nos. 25, 31, 32(b), 34]; (3) he instructed Gutierrez to file the Initial Conversion Schedules, the Initial Conversion SOFA, the Amended Conversion Schedules, and the Amended Conversion SOFA despite knowing that those documents contained inaccuracies or knowing that he had not checked to confirm that the information contained therein was entirely accurate, [Finding of Fact Nos. 32(c), 36]; (4) he failed to inform the Debtors that Carter would represent them at their meetings of creditors, [Finding of Fact No. 38(d)]; (5) he did not prepare Carter for either of the

---

[28] "Dignity: the quality of state of being worthy, honored, or esteemed; formal reserve of serious of manner, appearance or language,"  MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 323 (10th ed. 2001).

[29] "Integrity: Firm adherence to a code of especially moral or artistic values: Incorruptibility.  Synonym see Honest."  MERRIAN-WEBSTERS'S COLLEGIATE DICTIONARY 607 (10th ed. 2001).

Debtors' meetings of creditors, [Finding of Fact Nos., 38, 53]; (6) he filed, or allowed to be filed, an incorrect Rule 2016 Disclosure, [Finding of Fact No. 37]; and (7) he failed to own up to these transgressions until after the Chapter 7 Trustee brought them to the attention of the Court.  Each of these actions alone is cause for concern; taken together, they seriously undermine Aduwa's personal integrity and professional reputation.

In sum, Aduwa has seriously violated the guidelines for professional conduct required of attorneys authorized to practice in the Southern District of Texas.  Sanctions are therefore appropriate and will be subsequently discussed in this Opinion.

### E.    Aduwa Violated Local Bankruptcy Rule 1001-1(b) and Local District Rule 11.2 by Sending an Unprepared Appearance Attorney to the Meeting of Creditors

In addition to the provisions of Local Bankruptcy Rule 1001-1(b) outlined above, Local Bankruptcy Rule 1001-1(b) provides: "In addition to these rules, the Local Rules of the District Court . . . govern practice in the bankruptcy court."  Looking to the Local District Rules, Rule 11.2 states: "The attorney-in-charge is responsible in that action for the party.  That individual attorney shall attend all court proceedings, *or send a fully informed attorney* with authority to bind the client."  (emphasis added).

Aduwa did not send a "fully informed attorney"; rather, he sent an unprepared appearance attorney to represent the Debtors at their creditors' meetings on January 8, 2013 and January 22, 2013.  [Finding of Fact Nos. 38(d), 53].  Carter's presence at the January 22 meeting is especially egregious considering the inconsistencies in the Amended Conversion Schedules and the Amended Conversion SOFA that Ms. Bradley had discovered at the January 8 meeting.  Aduwa thus let his clients go to the January 22 meeting knowing that they would be under oath and be falsely swearing to the accuracy of the Amended Conversion Schedules and the Amended Conversion SOFA.  Moreover, Carter was contacted on extremely short notice before the

January 22 meeting, and was utterly unprepared to represent the Debtors during that meeting. [Finding of Fact No. 53].

Sending an unprepared appearance attorney violates Local District Rule 11.2 and Local Bankruptcy Rule 1001-1(b).  Bankruptcy Judge Wesley Steen (now retired) issued sanctions based on a similar violation of Local Bankruptcy Rule 1001-1(b).  *See In re Allen*, No. 06-60121, 2007 WL 115182, at *6 (Bankr. S.D. Tex. Jan. 9, 2007) (sanctioning a firm, in part, for sending unprepared local counsel to hearings).  By sending Carter not once, but twice, to the meetings of creditors without adequately preparing him, Aduwa violated Local District Rule 11.2 and Local Bankruptcy Rule 1001-1(b).  Sanctions are therefore appropriate and will subsequently discussed herein.

## F.    Aduwa Violated Bankruptcy Rule 2016 and 11 U.S.C. § 329(a) by Filing an Inaccurate Rule 2016 Disclosure

The Bankruptcy Code requires an attorney to disclose the compensation received for handling a debtor's case.  The Bankruptcy Code, in relevant part, states:

> Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of in connection with the case by such attorney, and the source of such compensation.

11 U.S.C. § 329(a).  Related to § 329, Bankruptcy Rule 2016 lays out the specific nature of the disclosure needed:

> Every attorney for a debtor, whether or not the attorney applies for compensation, shall file and transmit to the United States trustee within 14 days after the order for relief, or at another time as the court may direct, the statement required by § 329 of the Code including whether the attorney has shared or agreed to share the compensation with any other entity. The statement shall include the particulars of any such sharing or agreement to share by the attorney, but the details of any agreement for the sharing of the compensation with a member or regular associate

of the attorney's law firm shall not be required.  A supplemental statement shall be filed and transmitted to the United States trustee within 14 days after any payment or agreement not previously disclosed.

Fed. R. Bankr. P. 2016.

Together, § 329(a) and Bankruptcy Rule 2016 require an attorney representing a debtor to disclose in a Rule 2016 Disclosure, exactly and accurately, the compensation that the attorney will receive in exchange for representing the debtor.  Filing an inaccurate, incomplete, or false Rule 2016 Disclosure violates both Bankruptcy Rule 2016 and § 329(a), and is grounds for sanctions.  *See In re Johnson*, 411 B.R. 296, 300 (Bankr. E.D. La. 2008) (sanctioning an attorney, in part, for failing to amend the Rule 2016 Disclosure to reflect the compensation actually paid by the debtor); *In re Zuniga*, 332 B.R. 760, 783 (Bankr. S.D. Tex. 2005) (holding that an incorrect Rule 2016 Disclosure is a false statement of material fact made to the court); *In re Wright*, 290 B.R. 145, 155–56 (Bankr. C.D. Cal. 2003) (finding that full disclosure to the court is an absolute requirement of the bankruptcy process).

1. The Rule 2016 Disclosure Filed with the Conversion Falsely Listed the Compensation Paid by the Debtors

Here, the Debtors converted their case from a Chapter 13 case to a Chapter 7 case on December 17, 2012.  [Finding of Fact No. 25].  As part of the conversion, the Initial Conversion Schedules and the Initial Conversion SOFA were filed with this Court on January 4, 2013. [Finding of Fact Nos. 30, 31].  A new Rule 2016 Disclosure—listing the amount paid to the Firm for converting the Debtors' case from Chapter 13 to Chapter 7, and then taking on the representation, as $26.00—was also filed on January 4, 2013.   [Finding of Fact No. 37]. However, the Firm did not receive just $26.00 for these tasks.  In fact, it received payment of $524.00.  [*Id.*].  And, while the Amended Conversion Schedules and the Amended Conversion

SOFA were filed on January 7, 2013 [Finding of Fact No. 34], neither Aduwa nor the Firm has made any amendment to the incorrect Rule 2016 Disclosure.

2. The Rule 2016 Disclosure Was False Because It Did Not List Payments Made to Carter

When a lawyer wishes to share his fees with another practitioner in a bankruptcy setting, he must disclose the arrangement of the payments or fee sharing in the Rule 2016 disclosure. *In re Wright*, 290 B.R. at 155. Indeed, bankruptcy courts have made it clear that any attorney who appears on behalf of a debtor must be listed on the Rule 2016 Disclosure, regardless of whether they will receive monetary compensation. *See id.* at 155; *In re Bernhardt*, 2012 WL 646150, at *5 ("Rule 2016(b) also requires every attorney for a debtor, whether or not he or she applies for compensation, to file a statement under § 329."); *In re Johnson*, 411 B.R. at 301 (holding that all attorneys that appear on behalf of a debtor must be disclosed on the Rule 2016 Disclosure).

Disclosure is also required where an attorney who is not part of firm representing the debtor—but who works on the case—receives compensation for his work. *In re Johnson*, 411 B.R. at 301; *In re Wright*, 290 B.R. at 155. Further, disclosure is required even if the appearance attorney will only represent the debtor at a meeting of creditors. *In re Johnson*, 411 B.R. at 301 (citing *In re Greer*, 271 B.R. 426 (Bankr. D. Mass. 2002)). Even if an attorney does not initially know whether he will utilize another attorney not employed at the same firm to represent his clients, the attorney—once he or she does decide to utilize an appearance attorney—must file an amended Rule 2016 Disclosure within the fourteen (14) day time frame mandated by Bankruptcy Rule 2016(b). Full disclosure is important because the court is not merely a bystander in bankruptcy cases. Rather, the court is an active participant throughout the pendency of a debtor's case—particularly in circumstances like the case at bar, where it is imperative that financially-strapped debtors are not taken advantage of by attorneys requesting that additional

58

fees be paid. *See Padilla v. GMAC Mortg. Corp. (In re Padilla)*, 389 B.R. 409, 429 (Bankr. E.D. Pa. 2008) (finding that a bankruptcy court must play an active role in bankruptcy proceedings and that it has broad authority to act to prevent injustice and craft flexible remedies for both debtors and creditors); *see also In re Wright*, 290 B.R. at 155 (finding that full disclosure to the court is essential because it allows the court to craft the most equitable remedy, as well as to protect the integrity of the bankruptcy system).

Here—and in other cases where Carter is utilized by the Firm[30]—Carter is paid $100.00 for each appearance he makes at a meeting of creditors. [Finding of Fact No. 54]. Carter also receives compensation for any court appearance at which he appears in place of Aduwa. [*Id.*]. In this case, Carter appeared at both the January 8, 2013, and the January 22, 2013, meetings of creditors in Aduwa's stead. [Finding of Fact Nos. 39, 56]. Thus, Carter should have received $200.00 for appearing at these meetings; however, Carter is not listed on any of the Rule 2016 Disclosures, and neither has he filed his own Rule 2106 Disclosure with this Court. [Doc. No. 121 at 31]. Numerous cases make it clear that all attorneys who appear on behalf of the Debtor,

---

[30] The Court is concerned that this is not the only case in which Aduwa and the Firm have filed inaccurate Rule 2016 Disclosures. Aduwa's testimony at the April 26, 2013 hearing indicates that the Firm employs Carter regularly, and has done so for at least the last three years. [Finding of Fact No. 52]. Other testimony at that same hearing further indicates that the use of appearance attorneys is a regular occurrence in the Firm's practice. This Court is concerned that inaccurate disclosure has become a habit in this Firm, and other firms, with regards to informing the Court of the extent and nature of appearance counsel sent to represent debtors in the place of the attorneys at the firm retained by the debtor. Indeed, simultaneously with this Court's dealing with the case at bar, the Court is dealing with another consumer case where yet another "mill" firm—which, just like the Firm, has had substantial turnover of attorneys over the past few years—was using an appearance attorney and drew the ire of the debtor for such practice. *See In re Mioshi Yumeki Harmon*, Case No. 11-37913 (Bankr. S.D. Tex). The decision by the firm in that case to use an appearance attorney, combined with a constant stream of ever changing attorneys from the firm, angered the debtor: "I gave, uh, Bailey and Galyen two thousand something dollars and I done had two, three, different attorneys since then. I didn't even know who Mr. Alex [the most recent attorney hired by Bailey and Galyen to represent debtors in the Houston area] was until five minutes [before the previous hearing], when we came here the last time. . . . Nobody's communicating with me." [*In re Mioshi Yumeki Harmon*, Case No. 11-37913, Tape Recording, Apr. 4, 2013 Hearing at 11:38:26–11:39:01 a.m.]. With respect to when the appearance attorney was used to represent the debtor, this Court asked the debtor when was the first time she had met this appearance attorney, and she responded: "Five minutes ago, yes sir." [Id. at 11:39:02–11:39:07 a.m.].

regardless of their capacity, must be disclosed to the Court pursuant to Bankruptcy Rule 2016(b).
*See, e.g.*, *In re Wright*, 290 B.R. at 155.   By not amending the Rule 2016 Disclosure within
fourteen days of Carter appearing at either of the meetings of creditors—indeed, by *never*
amending the Rule 2016 Disclosure—Aduwa violated Bankruptcy Rule 2016(b).   Sanctions
against him are therefore appropriate and will be subsequently discussed in this Opinion.

## G.   Sanctions Will Also Be Imposed Against Macey, Aleman, and the Firm because Aduwa's Actions Are Imputed to Them

Aside from Aduwa, the Firm itself may also be sanctioned for violations of Bankruptcy
Rule 2016 and § 329.   *See In re Harwell*, 439 B.R. 455, 459-60 (Bankr. W.D. Mich. 2010)
(sanctioning the Firm for filing an inaccurate Rule 2016 Disclosure with the court); *In re Wright*,
290 B.R. at 155-56 (sanctioning a law firm for failing to disclose an appearance attorney
pursuant to Bankruptcy Rule 2016(b)).   Where an attorney violates local rules, courts may also
sanction the firm he works for, because the actions of employee-attorneys are imputed to their
firm.   *See In re Parsley*, 384 B.R. 138, 159 (Bankr. S.D. Tex. 2008) (citing *Religious Tech. Ctr.
V. Liebreich*, 98 Fed. App'x 979, 988 n. 30 (5th Cir. 2004)).   Additionally, where, as here, an
attorney acts in bad faith, his bad faith conduct is imputed to the firm that employs him or her.
*See In re Parsley*, 384 B.R. at 182–83 (finding that imputing responsibility onto a firm is both
correct as a matter of law, and also appropriate so as to impose responsibility on the firm for the
actions of a subordinate attorney).   Here, as Aduwa manages the Firm's Houston office [Finding
of Fact No. 19], as an employee, his actions, as well as his systemic bad faith, may be imputed to
the Firm.[31]   *See Religious Tech. Ctr. v. Liebreich*, 98 Fed. App'x at 998 n. 30 (imposing

---

[31] Aduwa—although the managing lawyer for the Firm's Houston office—is not a partner at the Firm.  [Finding of Fact No. 19].  If the Firm decides to accept the risk of a non-partner managing an office, then the Firm must also bear the consequences.

sanctions under 28 U.S.C. § 1927 jointly and severally against attorneys and their law firm); *Worrell v. GreatSchools, Inc.*, No. H-07-1100, 2007 WL 4223234, at *3 (S.D. Tex. Nov. 28, 2007) (imposing sanctions under Fed. R. Civ. P. 11 jointly and severally against an attorney and his firm).

Moreover, Macey and Aleman, individually, may be sanctioned for Aduwa's actions. Knowledge and actions are said to be imputed to all members of a firm; Macey and Aleman, as managing partners, are therefore charged with Aduwa's knowledge and actions. *See In re Depugh*, 409 B.R. 125, 141 (Bankr. S.D. Tex. 2009); *In re Anderson*, 330 B.R. 180, 187 (Bankr. S.D. Tex. 2005) (finding that knowledge and actions impute from one attorney at a firm to all other attorneys with whom they work). Partners at firms are further charged with knowing about the misdeeds and ill preparedness of the attorneys that they employ and supposedly supervise. *See In re Parsley*, 384 B.R. at 182. Therefore, it is appropriate for this Court to sanction Macey and Aleman, individually, as the partners responsible for supervising Aduwa and Gutierrez, in the hope that it will induce them to correct the systemic problems within the Firm.

**H.    Who Will Be Sanctioned, and What Rule or Statute Governs Each Sanction**

1.    Sanctions Will Be Imposed Under Bankruptcy Rule 9011(c) against Aduwa, the Firm, Macey, and Aleman

Bankruptcy Rule 9011(c) provides specific authority for this Court to sanction attorneys for violations of Bankruptcy Rule 9011(b). As discussed previously in section B, subsection 3, this Court has the authority to impose sanctions under 9011(c), as Aduwa, Macey, Aleman, Gutierrez, and the Firm received notice (via the SCO) and had a reasonable opportunity to respond to the allegations contained therein. Bankruptcy Rule 9011(c) also gives this Court wide latitude in imposing sanctions, which may include both non-monetary and monetary sanctions. *In re Wenk*, 296 B.R. at 728; *see also In re Yorkshire, LLC*, 540 F.3d at 333 (upholding the

bankruptcy court's imposition of attorney's fees for a violation of Bankruptcy Rule 9011(b));

*BFG Investments, L.L.C. v. Texas State Bank* (*In re TByrd Enterprises, L.L.C.*), No. 06-30078-H1-11, 2007 WL 4241705, at *7 (Bankr. S.D. Tex. 2007) ("[Bankruptcy] Rule 9011 sanctions may be imposed to deter conduct and may be payable to the court.").

First, this Court has the power to impose sanctions on Aduwa. He is the attorney who violated the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and the Local District Rules by directing the Firm's legal assistant (i.e., Gutierrez) to file the unsigned and un-reviewed Defective Pleadings as well as the false Rule 2016 Disclosure. Further, this Court has the power to sanction the Firm, Aduwa's employer, as well as Macey and Aleman. As quoted above, Bankruptcy Rule 9011(c) states that the Court may "impose an appropriate sanction upon the attorneys, *law firms*, or parties that have violated subdivision (b) or *are responsible for the violation*." Fed. R. Bankr. P. 9011 (emphasis added). Bankruptcy Rule 9011(c) thus includes the Firm as a party that the Court may sanction for violations of 9011(b). *See In re Allen*, 2007 WL 115182, at *5–6 (sanctioning the debtor's law firm under Rule 9011(c) for filing incorrect and untrue pleadings with the court). Rule 9011(c) also permits this Court to sanction those who are responsible for the violation, thereby allowing this Court to sanction the Firm's managing partners: Macey and Aleman. This, the Court will do.

2. Sanctions Will Be Imposed Under Bankruptcy Rule 2016 and § 329 against Aleman, the Firm, Macey, and Aleman

As discussed above, § 329(a) requires a full and accurate disclosure of the compensation and fees paid to attorneys who represent debtors. Bankruptcy Rule 2016 provides for the procedural rules that must be followed to satisfy § 329, including the timeline for filing amended disclosures and who must appear on those disclosure forms. Attorneys and firms that file incorrect or incomplete Rule 2016 Disclosures, or who fail to amend their Rule 2016 Disclosures

as necessary, may be sanctioned. *See In re Bernhardt,* 2012 WL 646150, at *6; *In re Johnson,* 411 B.R. at 303 (imposing sanctions for violating both 11 U.S.C. § 329 and Rule 2016).  Further, courts have the ability under § 329(b) to require a debtor's counsel to remit fees to the debtor "[i]f such compensation exceeds the reasonable value of any such services. . . ."  11 U.S.C. § 329(b).  Courts may therefore determine whether the fees were excessive, and if such a finding is made, a court may order the disgorgement of those fees.

Here, Aduwa filed a false statement of disclosure, and therefore he is liable.  Moreover, the Firm, Macey, and Aleman are also liable as a result of Aduwa's actions being imputed to them.  However, because the Firm, after the issuance of the SCO, returned to the Debtors the $524.00 that it took as a fee for handling the Chapter 7 case, [Finding of Fact No. 63], the issue of whether the fees should be disgorged has become moot.[32]

3.  Sanctions Will Be Imposed Under § 105(a) and this Court's Inherent Powers against Aduwa, Gutierrez, the Firm, Macey, and Aleman

Courts have the inherent power to sanction bad faith conduct.  *See Chambers*, 501 U.S. at 50–51.  Additionally, this Court has the power to sanction pursuant to § 105 of the Code.  Under § 105, the Court may issue any order that is "necessary or appropriate to carry out the provisions [of the Bankruptcy Code] or to prevent an abuse of process."  11 U.S.C. § 105(a).  Section 105 does not exist merely as a redundant statutory provision to address behavior sanctionable by other statutory provisions and rules.  Rather, § 105 is meant to "fill in the interstices" that Rules such as 9011(c) do not fill.  *See Chambers*, 501 U.S. at 33, 46–47 ("[O]ther [sanction]

---

[32] A separate and distinct issue is whether the Firm should be required to return the fees that it received for representation of the Debtors during their Chapter 13 case.  After all, the Firm also initially failed to accurately make the Rule 2016 Disclosure when the Debtors' case was a Chapter 13 case.  *See* [Finding of Fact Nos. 2, 4, 7, 13].  The Court concludes that the Firm should not be required to return these fees because the services of the attorneys employed at the Firm prior to Aduwa's taking charge of the Houston office did at least enable the Debtors to obtain confirmation of the Plan.

mechanisms, taken alone or together, are not substitutes for the inherent power, for that power is both broader and narrower than other means of imposing sanctions. . . . [W]hereas each of the other [sanction] mechanisms reaches only certain individuals or conduct, the inherent power extends to a full range of litigation abuses. *At the very least, the inherent power must continue to exist to fill in the interstices.* Even Justice Kennedy's dissent so concedes.") (emphasis added).

The Fifth Circuit has held that the imposition of sanctions using § 105 as well as the inherent power of the Court must be accompanied by a specific finding of bad faith. *In re Yorkshire, LLC*, 540 F.3d at 332; *Goldin v. Bartholow*, 166 F.3d 710, 722 (5th Cir. 1999); *In re Paige*, 365 B.R. 632, 638 (Bankr. N.D. Tex. 2007). In effect, this Court must find that the "very temple of justice has been defiled" by each party's conduct. *Goldin*, 166 F.3d at 722; *Cadle Co. v. Brunswick Homes, LLC* (*In re Moore*), 470 B.R. 414, 417, 436 (Bankr. N.D. Tex. 2012).

In the case at bar, Aduwa's transgressions eclipsed the narrow confines of Bankruptcy Rules 9011 and 2016(b), resulting also in violations of Bankruptcy Rule 5005(a)(2) (for improper electronic filing of the Debtors' Defective Pleadings with the Court) and Local Rules 5005-1 and 1001-1 (for improper electronic filing of the Debtors' same documents with the Court). The Court may therefore employ § 105 to sanction such misconduct.

It is clear that for the reasons stated above, Aduwa's actions have defiled the very temple of justice, and were in bad faith. *If instructing one's legal assistant (not once, but twice) to forge clients' signatures on the Schedules and the Statements of Financial Affairs that the attorney knows to be inaccurate—and then to file them—does not constitute bad faith, then nothing does.* Further, Aduwa's failure to personally meet with the Debtors to review the accuracy of Schedules and SOFA is bad faith, especially where—as here—the failure occurs more than once and puts the Debtors in the position of giving false testimony under oath. *See, e.g.*, *In re Nguyen*,

447 B.R. at 282 (upholding an imposition of sanctions under Bankruptcy Rule 9011(c) and § 105 that required an attorney to physically meet with clients for at least one hour to ensure that assets and debts would be discovered and properly scheduled).  Moreover, Aduwa's failure to maintain communication with the Debtors and not alert them that a different attorney—not employed by the Firm and not licensed by the State of Texas—would be representing them at the meeting of creditors is also bad faith.  Under all of these circumstances, the Court concludes that pursuant to § 105(a), sanctions should be imposed against Aduwa for his bad faith violations.

Gutierrez also acted in bad faith with regard to filing the Defective Pleadings.  She knowingly prepared and filed these documents without the Debtors' review. [Finding of Fact Nos. 25(a), 32(a), 35(a)].  Furthermore, Gutierrez has given inconsistent and contradictory accounts of the actions leading up to and immediately following the filing of these papers with the Court.  [Finding of Fact Nos. 29, 69].  Like Aduwa, her immediate supervisor, this Court finds that Gutierrez acted in bad faith when she prepared and filed the Defective Pleadings.  As an experienced legal assistant, Gutierrez knew that forging the Debtors' signatures and then filing the documents was dead wrong.  Once again, if forgery by a seasoned legal assistant is not bad faith, then nothing is.  Sanctions are in order for Gutierrez.

Additionally, this Court may, and will, impose sanctions against the Firm for these transgressions of Aduwa and Gutierrez.  Law firms are often called to account for the actions of their attorneys and legal assistants, as all firms owe a duty to adequately train and supervise the attorneys and legal assistants working for them.  *See In re Parsley*, 384 B.R. at 177 (finding that firms have an affirmative duty to train and supervise the attorneys working for them, but declining to impose sanctions against the firm because of the remedial measures already proposed by the firm); *In re Moffett*, No. 10-71929, 2012 WL 693362, at *6–8 (Bankr. C.D. Ill.

March 2, 2012) (sanctioning a firm for failing to supervise clerical staff). Further, courts may use their inherent sanctioning powers to sanction attorneys and firms for violations of local rules. *See In re Hessinger & Associates*, 192 B.R. 211, 223 (N.D. Cal. 1996) (affirming the bankruptcy court's imposition of sanctions for violations of local rules). The Firm employs both Aduwa and Gutierrez, and their bad acts are imputed to the Firm. Additionally, the numerous sanctions proceedings that the Firm has been subject to in recent years support this Court's finding of bad faith on the part of the Firm.

    4.   The Effect of Past Misconduct on the Imposition of Sanctions Now Imposed by this Court

    Neither Aduwa nor Gutierrez have ever been sanctioned in their careers, and the Court will certainly give this fact consideration in imposing sanctions on them (discussed subsequently herein).

    This is the first time Aduwa and Gutierrez have been subject to sanctions, however, it is *not* the first time the Firm has run afoul of the rules governing proper and fair bankruptcy practice. The Firm, which is clearly what is known in the consumer bankruptcy practice as a "mill" firm,[33] has been sanctioned in the past. In fact, this Court has found at least five cases since 2009 where the Firm was sanctioned for some aspect of its representation of a debtor. This is also the second time the Firm has been sanctioned, and the third the Firm has been subject to a

---

[33] A "mill" firm is a firm whose business model is dependent upon bringing in a large volume of consumer debtor clients while simultaneously minimizing expenses by having as few attorneys as possible, who are paid extremely low salaries. The history of the Firm's Houston office represents the worst characteristics of a "mill" firm. The turnover rate among attorneys, and the experience level of those attorneys, is telling. As highlighted in the *Salinas* case, the following associate attorneys worked at and then departed the Firm in short order: Daniel Ciment, Martin Pack, Christopher Lawyer, Michael Weems, James Ferguson, Betsy Thomas, Tiffany Pratt, and Terena Molo. *See also* [Finding of Fact Nos. 3, 9, 12, 17]. After the departure of these attorneys, Aduwa became the sole attorney at the Firm's Houston office, and the Firm represented to this Court that because he had more experience, he would do a better job of providing representation to debtors than the others who preceded him. His performance in representing the Debtors in the case at bar does not bear this out. Moreover, the Firm's training and supervision of Aduwa is no better today than it was when Aduwa's predecessors were employed in the Houston office.

Show Cause order in *this* Court since 2010.  In considering the sanctions to impose on the Firm, this Court must obviously focus on the egregiousness of the conduct set out in the SCO in the case at bar.  Yet, also relevant to this Court's determination of appropriate sanctions is whether the conduct at issue was an isolated incident or part of a consistent pattern of activity.  *In re Stomberg*, 487 B.R. at 818; *In re Allen*, 2007 WL 1747018, at *2; *see also In re Betiste*, No. 03-10398, 2009 WL 2849077, at *4 (Bankr. E.D. La. July 14, 2009) (finding sanctions appropriate, in part, because of the past abuses of the bankruptcy system); *In re Layer*, No. 06-306, 2007 WL 2229624, at *11 (Bankr. N.D. Tex. July 31, 2007) ("prior sanctions levied by this court...have apparently had little effect such that the court must be creative and more stringent in imposing sanctions so that they will, this time, have the appropriate coercive effect"); *In re Porcheddu*, 338 B.R 729, 742–43 (Bankr. S.D. Tex. 2006) (basing the amount of monetary sanctions on a firm's past conduct).

This Court has already discussed its conclusions that the conduct of Aduwa, Gutierrez, Macey, Aleman, and the Firm, referenced in the SCO, was in bad faith and defiled the very temple of justice.  Therefore, the Court now focuses on the Firm's past misconduct in this, and other, courts.  Although, the Firm has not been sanctioned in the past for all of the exact conduct set forth in the SCO—namely, failure to supervise an attorney so much so that forged documents are filed with the court, and failure to meet with the client before repeatedly filing materially inaccurate Schedules and SOFA—the Firm's conduct relating to the SCO and its prior conduct in this and other courts, taken together, indicate that: (1) the Firm has frequently engaged, and to this day continues to engage, in improper behavior; (2) prior sanctions and admonitions to the Firm have failed to deter repetition of improper and harmful conduct; and (3) finally, now, in the case at bar, severe sanctions are warranted.

### a.   *In re Harwell*

In 2010, the Firm represented Elizabeth Harwell, a Michigan resident, during her Chapter 7 case.  *In re Harwell*, 439 B.R. at 457.  In August of that year, the debtor sent a letter to the United States Bankruptcy Court for the Western District of Michigan complaining that her legal counsel (i.e., the Firm) failed to adequately represent her during her case.  *Id.* at 456.  The court issued a show cause order and a hearing was held on the matter.  Thereafter, the court made several conclusions of law and handed down sanctions against the Firm.

Among its transgressions, the Firm failed to properly disclose its use of an appearance attorney to the court.  *Id.* at 458.  Like it did in the case at bar, the Firm employed a local attorney to appear at its client's meetings of creditors.  *Id.*  The court concluded that since the Firm did not charge the debtor additional fees for the appearance attorney, it had shared its fee with this appearance attorney.  *Id.*  As a result, the Firm had violated Bankruptcy Rule 2016. Additionally, the court found a variety of general billing errors and unexplained charges during an examination of the payments made to the Firm by the debtor.  *Id.* at 458–59.  The court found that several of these fees were in excess of reasonably appropriate charges and several were also undisclosed.  *Id.* at 459.

The court was further dissatisfied with the manner in which the Firm prepared and filed its response to the show cause order.  *Id.* at 460.  The court noted that several of the exhibits, and other documentation related to the response, were either incomplete or sloppy, including a missing signature as required by Bankruptcy Rule 9011 and a handwritten caption necessitated by Bankruptcy Rule 9004.  *Id.*  The court found that the Firm also failed to live up to its obligations under Western District of Michigan local rules; specifically, the Firm failed to properly redact exhibits that contained arguably privileged information.  *Id.*  The court found, in

general, that the Firm was sloppy in its work and that there was a lack of deliberation and thoughtfulness in its filings. The court imposed sanctions by requiring a disgorgement of fees to the debtor totaling $500.00. Though it was dissatisfied with several representations made to the court, the court did not order the full disgorgement of fees because it found that the Firm did an adequate job of helping the debtors file their bankruptcy and obtain a discharge. *Id.*

The Firm should have learned from the sanctions imposed in *Harwell* that, at the very least, it must properly disclose the use of an appearance attorney. Yet, in the case at bar, the Firm never disclosed to this Court that it was using Carter as an appearance attorney. Additionally, strikingly reminiscent of the Firm's sloppiness and inattentiveness complained of by the court in *Harwell*, are the following examples in the case at bar: (1) the failure to maintain proper signature records (i.e., "wet" signatures), [Finding of Fact Nos. 32(b), 35(b), 68, 70]; and (2) Gutierrez using Pack's signature to sign the Notice of Conversion when Pack had departed the Firm over two and a half years prior to the filing of this Notice of Conversion, [Finding of Fact No. 10, 25].

### b. *In re Love*

In *Love*, the Firm undertook representation of an active duty U.S. Army Sergeant. 461 B.R. at 31. The Firm represented to the debtor that she did not qualify for Chapter 7 relief and, as a result, the debtor filed a Chapter 13 petition. The plan, confirmed on July 15, 2009, called for the debtor to pay $1,200.00 per month to the trustee. The total amount of fees and expenses awarded to the Firm under the plan was $3,957.00. *Id.*

Contrary to the representations of the Firm, the debtor in fact qualified for Chapter 7 relief. A vast majority of her debts were business in nature, and her active duty status in the military would have exempted her from means testing under 11 U.S.C. § 707(b)(2)(D). Despite

the plain language of this section, the Firm failed to recognize that the debtor could safely file under Chapter 7.  The debtor ended up making payments on her Chapter 13 plan for two years before obtaining new counsel, filing a Chapter 7 case, and receiving a discharge.  Subsequent to the discharge of her bankruptcy under Chapter 7, the debtor moved for the disgorgement of fees from the Firm.

The court examined the actions taken and the advice given to the debtor by the Firm and concluded that the Firm's legal representation of the debtor was woefully inadequate.  The court found that the Firm's lawyers that had originally handled the debtor's case "showed indifference to her interests, and a shabby lack of work, care, scholarship and ability in representing her."  *Id.* at 33.  The court was also most disturbed by the Firm's continued failure to recognize the basic legal errors that their lawyers made.  *Id.* at 32.

The court ordered the full disgorgement of the fees paid to the Firm by the debtor, less the expenses and the filing fee otherwise allowed.  *Id.*  Further, the court ordered Aleman and Macey to appear before the court and explain the procedures, training, and supervisory reforms they would put in place to ensure that such basic legal errors would not be repeated.

In the case at bar, the Firm showed a similar indifference to the quality of representation it provided to the Debtors.  Aduwa's failure to sit down and meet with the Debtors to review their options, including attempting to further amend the Modified Plan instead of converting to Chapter 7; his failure to review documents with the Debtors before filing them with the Court; his failure to conform to the rules requiring "wet" signatures on documents, instead preferring to seek convenience in simply forging and electronically signing documents; and his use of an appearance attorney for both meetings of creditors, rather than rescheduling his conflicting obligation on January 8, or seeking a continuance on January 22, are all similar in nature to the

70

fundamental legal errors committed in *Love* and tend to show a culture at the Firm of sloppiness, carelessness, incompetence, and lack of concern in the representation of clients. Stated differently, the Firm's culture promotes representation of clients that is anything but zealous.

### c. *Consolidated Cases in the Northern District of Texas*

On November 9, 2009, the Bankruptcy Court for the Northern District of Texas held a show cause hearing on its Order For Jeffery J. Aleman to Appear and Show Cause Why Macey and Aleman Should Not be Sanctioned. *In re Schoch*, No. 05-44801-RFN-13.[34] The show cause hearing arose as a result of the manner in which the Firm handled the closing of its Dallas/Ft. Worth Metroplex area office in the fall of 2009.

The Firm decided to cease operations in the Dallas/Ft. Worth Metroplex and, rather than see its pending cases to completion, the Firm attempted to farm them off to a different firm. The attorney who worked for the Firm at that time properly withdrew his name from the cases; however, the Firm did not take the proper steps to assist its clients in obtaining substitute counsel. Instead, the Firm sent announcements to its clients telling them, in essence, that the Firm was no longer representing them and that they—the clients—would have to contact a different firm if they wished to retain continued legal counsel. What followed was a confusing and distressing period where the Firm's clients were left uninformed, under-informed, or totally in the dark as to how to proceed. The alternative law firm listed for the clients to contact did not follow the procedures outlined in the Firm's original letter to its clients. Indeed, many of the

---

[34] For the convenience of that court, multiple cases were consolidated into one for the show cause hearing. Bankruptcy Judge Russell Nelms consolidated all bankruptcy cases being handled by the Firm at that time—thirty-one (31) in all—into a single action. For a complete listing of all of the cases to which this order pertains, see [*In re Schoch*, No. 05-44801-RFN-13, November 30, 2009 Order Sanctioning Macey and Aleman, LLP (D/B/A/ Legal Helpers)]. Courts may take judicial notice of findings entered in other cases where there is a common connection between some material elements of those cases—and, here, the common connection is the Firm and any sanctions imposed against it. *See Clay*, 581 F.2d at 1192; *see also In re TXCO Res., Inc.*, 2010 Bankr. LEXIS 5660, at *10.

clients were left with the choice between either incurring further substantial monetary expenditures or proceeding *pro se*.   [*In re Schoch*, No. 05-44801-RFN-13, November 20, 2009 Tr. 13:24–15:6].

By attempting a unilateral withdrawal from the representation of its clients, the Firm violated numerous Northern District of Texas local rules, as well as the very spirit of what it means to provide legal representation.   There is no such thing as a unilateral withdrawal from representation of a debtor [*Id*. at Tr. 9:16–19], and the Bankruptcy Court for the Northern District of Texas rebuked the Firm in the strongest terms.   Bankruptcy Judge Nelms chided the Firm for abandoning its clients and further admonished the Firm for its incorrect representations to its clients that there was no way the Firm could continue to represent them.   Judge Nelms also took issue with the vague and potentially misleading language the Firm used to communicate the situation to its clients.   [*Id*. at Tr. 13:15–13:23].

In the end, Judge Nelms handed down severe sanctions against the Firm.   He ordered the Firm to repay several of the debtors' fees and even left the door open for other former clients to request that their fees be returned.   [*In re Schoch*, No. 05044801-RFN-13, November 30, 2009 Order Sanctioning Macey and Aleman, LLP at 5-7].   Judge Nelms further directed the Firm to ensure that its remaining clients were represented in the Northern District of Texas.   [*Id.*]. Finally, Judge Nelms ordered that the Firm be suspended from the practice of law in the Northern District of Texas for a period of two (2) years from the date of the closing of the last of the Firm's cases in the District.   [*Id.* at 8].   The fact that none of the Firm's attorneys were sanctioned in this case—only the Firm itself—underscores Judge Nelms's belief that the problems with the Firm in the Northern District of Texas were the result of management decisions about how to conduct business, rather than the result of the misconduct of individual

attorneys.  The responsibility for the errors therefore lay within the very head of the beast: the management of the Firm.

The Firm's failure to consider all aspects of a case and provide counsel in the best interest of the debtor, rather than the Firm, is again on display in the case at bar.  Whether or not it was the best option for the Debtors, Aduwa—and most definitely Gutierrez, a legal assistant—should not have counseled Ms. Bradley that her *only* option to save any of her assets was to convert her case to a Chapter 7.  Other options existed, such as filing a motion for extending the December 17 deadline or seeking another amendment to the Modified Plan.  Additionally, Macey and Aleman made the business decision to send an associate attorney—not a partner—to manage the Houston office.  As in the consolidated cases in the Northern District of Texas, the management of the Firm has failed to consider the needs of its clients when making business decisions, and the Firm's clients are harmed as a result.  The Firm has an obligation to provide the best legal representation that it possibly can to its clients; instead, the Firm displays a pattern of placing its own needs first and allowing its clients to suffer as a result.

### d. *In re Salinas and In re Williams*

In 2010, this Court had the opportunity to deal directly with the Firm on a case similar to the one at bar.  In *Salinas*, this Court issued a show cause order requiring one of the Firm's attorneys, Deborah Stencel, as well as Messrs. Macey and Aleman, to appear and show cause why they, individually—as well as the Firm—should not be sanctioned.  [*In re Salinas*, No. 06-33383, Doc. No. 104 at 1].  In fact, the Court had already issued a show cause order, and had held a hearing at which Stencel was required to appear.  [*Id.*].  This hearing, held in November of 2010, was to discuss the discrepancies between the various Rule 2016 Disclosures filed by Stencel and other attorneys employed by the Firm.  [*In re Salinas*, No. 06-33383, Doc. No 94].

Stencel not only failed to appear at the hearing, but she failed to notify her client about the hearing.  By coincidence, the debtor made it to court that day anyway, and testified about her unhappy experiences being represented by Stencel and the Firm.  According to the debtor, Stencel was virtually unreachable at the Firm's Houston office.  [*In re Salinas*, No. 06-33383, Doc. No. 104 at 2].  In fact, many clients had neither a current phone number for the Firm's Houston office, nor the phone number of the attorney who represented them (i.e., Stencel). Clients of the Firm were given a toll-free number that routed them to a central call center, which would notify their attorney to return their call if need be, or attempt to place the client in contact with their attorney, but there was no way for a client to directly attempt to get in touch with their attorney.  [*In re Salinas*, No. 06-33383, Tape Recording, Dec. 20, 2010 Hearing at 10:52:25– 10:54:42 a.m.].  In fact, the management of the Firm did not want clients to be able to directly contact their attorneys because they believed that having to deal with questions from clients was a distraction for the attorneys, and that they could provide better managerial oversight by centralizing all communications.  [*Id.*].

Given the debtor's testimony at this first hearing, the Court decided to hold the second show cause hearing on the matter and directed not only Stencel, but also Macey and Aleman to appear.  [*In re Salinas*, No. 06-33383, Doc No. 104 at 2].  The Court held the show cause hearing on December 20, 2010, and subsequently imposed a variety of sanctions against Stencel and the Firm.  [*In re Salinas*, No. 06-33383, Doc. No. 119].

The Court combined the show cause aspects of the December 20, 2010 hearing in *Salinas* with a different show cause order, issued in the case of [*In re Williams*, No. 08-31607, Doc. No.

115].[35]  The Court imposed monetary sanctions against Stencel in *Salinas*, as well as required the disgorgement of the Firm's fees in *Williams*.  [*In re Salinas*, No. 06-33383, Doc. No 120].  The Court also required the Firm to provide all of its clients in the Southern District of Texas with a correct and current Houston office telephone number.  [*Id.* at 1].

In the case at bar, the Firm has continued to show the same lack of attention to its clients that was shown in *Salinas* and *Williams*.  The Firm failed to ensure that its Rule 2016 Disclosure statements were correct, failed to meet with the Debtors to review the accuracy of documents filed with the Court, failed to prepare Carter for his appearances at the creditors' meetings, and failed to follow the proper procedures regarding signatures on electronically filed documents. Despite all of these problems, all of which the Firm was, or should have been, aware, Aduwa decided that the appropriate course of action was to accept the substandard representation that would necessarily result from having Carter (who was not fully informed of the Debtors' case) represent the Debtors at the meeting of creditors, rather than to file a motion for continuance and seek to rectify the numerous problems.

### e. *In re Leslie*

Prior to 2009, the Firm contracted to represent Donald and Carol Leslie in their bankruptcy in the State of Indiana.  *In re Leslie*, No. 09-40128, 2009 Bankr. LEXIS 2684, at *1 (Bankr. N.D. Ind. August 26, 2009).  On June 10, 2009, the United States Bankruptcy Court for the Northern District of Indiana scheduled a hearing regarding the confirmation of the debtors'

---

[35] In *Williams*, the debtor approached the Court with a number of complaints about the Firm very similar to the ones that *In re Salinas* raised.  These included: dealing with a myriad of attorneys unfamiliar with the Debtors' file; the repeated failure of the Firm's attorneys to file motions in a timely manner; and difficulty communicating with the Firm and the lawyers representing the debtor.  [*In re Williams*, No. 08-31607, Doc. No. 115].  This Court issued a show cause order in *Williams* on the very same day it issued the show cause order in *Salinas*, and one hearing was held to adjudicate the issues in both cases.

proposed Chapter 13 plan.  *Id*. at *1.  Although the debtors and the trustee arrived at the hearing on time, the debtors' attorney, Michael Cox (Cox)—an attorney with the Firm—did not.  *Id*.  As a result, the debtors' plan was denied and the court issued a show cause order, requiring Cox to demonstrate in writing why he should not be sanctioned for his failure to appear.  *Id*.

In his response, Cox admitted that he knew about the hearing, and had in fact received the electronic notice of the hearing.  *Id*. at *3.  Cox failed to attend because the person who received the notice was not the same person who placed items on the electronic calendar, and through an oversight, the hearing was not scheduled on the office calendar.  *Id*.  The court acknowledged that the absence was "not willful or contumacious" but rather simply negligent.  *Id.* at *4.  Negligence, however, did not make the absence "substantially justified."  *Id*.  As a result of his failure to appear, Cox was sanctioned in the amount of $200.00.  *Id*. at *5–6.  Cox was also required to pay the reasonable attorneys' fees that the trustee incurred in preparation for the hearing that Cox failed to attend.  *Id*. at *5.

In the case at bar, Aduwa showed a similar indifference to the needs of the Debtors, and the Trustee.  He clearly did not care whether they were properly represented at the meetings of creditors.  Indeed, the January 22 meeting of creditors should have been a priority for him, considering the train of errors up to that point, and the debacle at the January 8 meeting.  If Aduwa truly felt ill on January 22, he should have moved for a continuance instead of—yet again—sending an unprepared appearance attorney.

### f.   Summary of Past Sanctions Against the Firm

Prior to the matter now at bar, the Firm has been subject to show cause orders and sanctions at least six times.[36]  Two of those show cause orders were before this Court.  In all these prior instances, the Firm showed a lack of control over its attorneys and an utter disregard for its clients.  The Firm has repeatedly acted in ways that are contrary to the very essence and purpose of legal representation.  Accordingly, in imposing sanctions, just as this Court will give consideration to the fact that neither Aduwa nor Gutierrez has ever been sanctioned, so will this Court take into account that with respect to the Firm, it has been sanctioned in multiple instances in the past.

### 5.   Monetary Sanctions to be Imposed Against Aduwa

In imposing sanctions, the Court must issue the "sanction that furthers the purposes of Rule 11 and is the least severe sanction adequate to such purpose."  *Jenkins v. Methodist Hospitals of Dallas, Inc.*, 478 F.3d 255, 265 (5th Cir. 2007).   Here, because Aduwa's transgressions were deliberate and evince a complete lack of concern for his responsibilities to the Debtors and the judicial process—in other words, Aduwa's actions were in bad faith—the Court finds that monetary sanctions are warranted to deter future repetition.  *See American Airlines, Inc. v. Allied Pilots Ass'n*, 968 F.2d 523 (5th Cir. 1992) (upholding substantial monetary fines as sanctions for the willful filing of forged electronic signatures with the court).

---

[36] It would seem that the numerous sanctions have caused the Firm some difficulty.  The Court found no less than four different names under which the Firm has operated and represented clients within the last four years.  The Firm currently does business as Jacoby & Myers Bankruptcy, LLP, and in the past the Firm has gone by: (1) Macey and Aleman, LLP; (2) Macey Bankruptcy, P.C.; and (3) Legal Helpers P.C.  Such a constant changing of names gives the appearance of being a "fly-by-night" firm trying to avoid the glare and ill repute associated with being sanctioned.  It gives the impression that the Firm seeks the quick and easy route to a new reputation, rather than seeking to genuinely provide quality representation to its clients.

As outlined by this Opinion, and summarized here, the Court concludes that Aduwa committed eight (8) violations of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and the Local District Rules as set forth below:

1. On five (5) separate occasions Aduwa directed Gutierrez to forge the Debtors' signatures on each of the Defective Pleadings, and then he directed Gutierrez to file those documents electronically with the Court;

2. Aduwa filed an inaccurate Rule 2016 Disclosure with the Court, and then failed to amend the disclosure to include Carter as an attorney who would be representing the Debtors and, additionally, to disclose the fees of the Firm;

3. Aduwa, as the attorney-in-charge, failed to ensure that Carter was fully informed about the Debtors' case prior to Carter's appearance at the January 8, 2013 meeting of creditors; and

4. Aduwa, as the attorney-in-charge, failed to ensure that Carter was fully informed about the Debtors' case prior to Carter's appearance at the January 22, 2013 meeting of creditors.

For each of these violations Aduwa shall pay to the Clerk of the Court $500.00, for a total amount of $4,000.00.  But, because this is the first time that Aduwa has had sanctions imposed against him, if he pays $800.00 of this $4,000.00 sanction within thirty (30) days following the entry of the order, then the remaining $3,200.00 will we waived.

6. <u>Monetary Sanctions to be Imposed Against Gutierrez</u>

As outlined in this Opinion, Gutierrez committed six (6) violations of the Bankruptcy Rules and the Local Bankruptcy Rules.  Specifically, she filed documents with this Court on five separate occasions (i.e., the Defective Pleadings), despite knowing that the Debtors had not

signed the documents and that she had therefore forged their electronic signatures.  Monetary sanctions are appropriate because Gutierrez's violations were willful and she was aware of their impropriety; stated differently, her actions were in bad faith.  However, because she took these actions at the direction and under the supervision of Aduwa, she should pay a lesser amount than Aduwa to the Clerk of the Court: $100.00 for each violation.  Additionally, there is a sixth violation: by counseling Ms. Bradley about converting from a Chapter 13 to a Chapter 7, Gutierrez was engaging in the unauthorized practice of law.[37]  For this particular violation, the Court will impose a $250.00 monetary sanction against Gutierrez.  Her total sanction therefore equals $750.00.  Such sanctions are the least severe necessary to deter future repetition.  Because this is the first time that Gutierrez has had sanctions imposed against her, if she pays $150.00 of this $750.00 sanction within 30 days following the entry of the order, then the remaining $600.00 will be waived.

       7.   <u>Monetary Sanctions to be Imposed Against Macey, Aleman, and the Firm</u>

In sanctioning a law firm, this Court must scrutinize the conduct in the pending case, and it must also look to past bad actions of that firm and base its determination of sanctions on the number and severity of prior bad acts.  *In re Porcheddu*, 338 B.R at 742–43.  As outlined above, this Court has previously sanctioned the Firm, as have other courts around the country.  *See In re Love*, 461 B.R. 29; *In re Harwell*, 439 B.R. 455; *In re Leslie*, 2009 Bankr. LEXIS 2684, at *1; *In re Schoch*, No. 05-44801-RFN-13; *In re Salinas*, No. 06-33383; *In re Williams,* No. 08-31607.

---

[37] Ms. Bradley's testimony about the legal advice given to her by Gutierrez was as follows: "I contacted the attorney's office and they told me the only thing that would save me or any of my assets would be to file a Chapter 7 and that was actually told to me by Ray [i.e., Gutierrez], the legal assistant.  So that is when I made the decision, that is when we made the decision, to file a Chapter 7."  [Tape Recording, Apr. 26, 2013 Hearing at 11:59:13–11:59:29 a.m.].

None of these past sanctions have yet had the desired effect of convincing the Firm to correct its deficiencies.

Here, employees of the Firm, who are under the supervision of both Macey and Aleman, committed a total of fourteen (14) violations of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and the Local District Rules.  Aduwa committed eight (8) violations and Gutierrez committed six (6).  Despite the serious nature of the sanctions in *Salinas*, and their personal attendance at the show cause hearing in that case, Macey and Aleman chose to send Aduwa to manage the Houston office.  Aduwa is not a partner, and the Firm should have supervised him more closely.  Sending an employee to "hold down the fort" at a shrinking office, rather than addressing head on the underlying problems brought to light in *Salinas*, demonstrates a decided lack of concern for the quality of representation that the Firm provides to its clients.

The leadership of the Firm has failed to grasp the serious, and continuing nature of the problems with its practice, both nationwide and in the Houston office in particular.  Accordingly, this Court finds it necessary to once again impose sanctions on the Firm, as well as both of its name partners.  Pursuant to Federal Bankruptcy Rule 9011 and § 105 of the Bankruptcy Code, the Court may impose sanctions that are sufficient to "deter repetition of such conduct or comparable conduct by others similarly situated." Fed. R. Bankr. P. 9011(c)(2).  Because this is the second time that this Court has found it necessary to sanction the Firm for such conduct, previous sanctions have obviously failed to "deter repetition."  As Ms. Bradley said, "You've done it before. You know you've done it before, . . . you just got caught this time, again."  [Tape Recording, Apr. 26, 2013 Hearing at 12:05:59–12:06:27 p.m.].  Moreover, the conduct has been extremely egregious; forgery, for example, is a serious matter.  Therefore, for each of Aduwa's violations, Macey, Aleman, and the Firm shall be jointly and severally liable for $500.00.  For

each of Gutierrez's violations, Macey, Aleman, and the Firm shall be jointly and severally liable for $100.00, except that for her unauthorized practice of law, the amount shall be $250.00.   In total, Macey, Aleman, and the Firm are jointly and severally liable to pay to the Clerk of the Court $4,750.00.   However, since this is the second time this Court has had to sanction the Firm, the sanction of $4,750.00 will be doubled.   Accordingly, Macey, Aleman, and the Firm are jointly and severally liable for $9,500.00.[38]

8.   <u>Non-Monetary Sanctions to be Imposed Against the Firm</u>

As outlined by this Opinion, the Firm has engaged in a pattern of filing false and misleading documents with this Court and other courts.   The examination conducted by Kirkendall of the Firm's current case files (showing a lack of "wet" signatures) and the past sanctions against the Firm indicate a systematic deficiency in the ethical and professional conduct of the Firm as a whole.   This Court, therefore, finds it both necessary and appropriate to issue additional non-monetary sanctions against the Firm in order to deter future repetition of such conduct by the Firm.

Gustafson testified at the hearing on April 26, 2013, that the Firm is considering closing its Houston office.   [Tape Recording, Apr. 26, 2013 Hearing at 10:28:04–10:30:57 a.m.].   The Court will hold a status conference hearing on September 30, 2013, to determine if the Firm has indeed taken further steps to close its Houston office.   If the Firm has indeed closed the Houston office, then the Court finds that no additional action will be necessary.   If, however, the Firm has

---

[38] The Court recognizes that after this Court issued the SCO, the Firm returned the conversion fee to the Debtors and paid the legal expenses incurred by the Trustee and the U.S. Trustee.   [Finding of Fact No. 63].   While the Court appreciates the actions taken by the Firm in this respect, it is not sufficient to avoid the $9,500.00 sanction that this Court has imposed.   The Firm has simply not learned from its past sanctions, and, moreover, the conduct in the case at bar has been particularly outrageous.   Filing forged documents knowing that they contain inaccuracies is beyond the pale.   The Court hopes that this $9,500.00 sanction will make the Firm see the light.   If it does not, then the Firm will continue to feel the heat in the future.

not closed the Houston office by the date of this status conference, but instead intends to continue representing clients in the Southern District of Texas, then the Court will issue an order requiring that the Firm take the following steps by no later than November 30, 2013:

1. The Firm must designate one of its partners to be in charge of the Houston office;

2. The designated partner must reside in the greater Houston area;

3. The partner must be designated as the attorney-in-charge for all cases pending in the undersigned judge's court and sign all pleadings as such, pursuant to Local District Rules 11.1 and 11.3; and

4. Beginning November 30, 2013, and on the 30th day of each month thereafter—provided however, that if the 30th day falls on a weekend or holiday, then on the next business day—the partner in charge of the Houston office must attend a status conference in each case over which the undersigned judge presides (where the Firm is counsel for the debtor) to review all filings that have occurred since the date of this Opinion and ensure that the proper "wet" signatures have been obtained.

## I.     Appearance Attorneys

The case at bar is just the most recent example of many instances in which the undersigned judge has observed how the use of appearance attorneys is detrimental to the bankruptcy process. This Court is now convinced that this practice must stop. No one can deny that attorneys are busy people. Their days are a relentless string of phone calls, emails, meetings with clients, and documents needing preparation. Not only that, they must find the time to tear themselves away from their other work, load up their notes on a case, and come before a court to represent their clients. A day spent in court can put a lawyer further behind on all other commitments for existing clients and also reduce the amount of time the lawyer has to interview

prospective clients.  This is especially true in the field of consumer bankruptcy, where the name of the game—at least for some attorneys—is often a volume business.  Moreover, the fees for consumer debtors' attorneys are generally fixed, rather than based on billable hours.  Thus, to survive, and hopefully prosper, a consumer debtor's attorney must have a steady stream of new clients, and be efficient enough to handle every case that comes through the door.  In an effort to undertake the representation of as many consumer debtors as possible, some attorneys have simply decided that they need to remain in their office to conduct interviews with prospective clients; and because these attorneys stay in the office, they need someone to attend court hearings and meetings of creditors; hence, these attorneys, as part of their business plan, now employ an appearance attorney to handle proceedings at the courthouse.  Like Carter, these appearance attorneys are neither partners nor associates with the attorney who requests them to handle all matters at the courthouse.  Rather, they are contract workers that are paid on a "per appearance" basis.  The undersigned judge has now come to the conclusion that the use of appearance attorneys poses such significant problems to the proper and effective administration of the consumer debtor cases over which he presides that their use must be barred.

    1.  <u>Inherent Problems with Appearance Attorneys</u>

As far back as the mid-nineties, the use of appearance attorneys became a trend in various bankruptcy courts across the country.  Mund, *supra*, at 343.  Appearance attorneys generally appear on behalf of the debtor's attorney during short hearings before the court and at meetings of creditors.   Though these proceedings can be quick and painless, there are certainly times— such as in the case at bar—where important or major issues are revealed during those proceedings.  Just as has happened in the case at bar, the use of an appearance attorney can lead to awkward moments when that appearance attorney—who is typically not fully informed about

the debtor's case—is faced with an unanticipated situation.  Introducing an alternative lawyer into the mix can also frustrate the negotiation and communication process among the debtor, the creditors, and the trustee.  *See In re Jacobson*, 402 B.R. at 365.

One of the largest problems courts and commentators have identified with appearance attorneys is the potential lack of accountability.  Appearance attorneys are rarely listed as an attorney of record or co-counsel in a case and this can raise questions as to the legitimacy of their representation of debtors and their authority to speak for, or make admissions on behalf of, the debtor.  *Id.*  While many appearance attorneys are competent lawyers, others are "[m]ere drones who give inadequate representation."  Mund, *supra*, at 343.  If a court cannot determine who has the authority to speak on behalf of a debtor, a sizeable and unnecessary roadblock is thrown up in front of the bankruptcy process.  The court overseeing a bankruptcy case must know who speaks for a debtor and whom it can hold accountable for any improprieties in the process.  Additionally, and as importantly, debtors are left in an awkward position of having to trust the work of an attorney with whom they have never met and did not hire.  They must have faith that their own attorney has exercised good judgment and has chosen a quality lawyer to appear on his behalf.   Such practices can leave clients vulnerable to substandard representation and attorneys vulnerable to sanctions and other disciplinary measures.  *See Symposium*: *Old Code, New Code: Views on Bankruptcy From the Bench and Bar: Panel 2: Ethics: New Challenges For Attorneys Under the New Code*, 4 DEPAUL BUS. & COMM. L.J. 567, 584 (2006).

Similar to the problem of a lack of accountability, appearance attorneys help promote lazy and poor lawyering.  Though there is no way of knowing how widespread the phenomenon is, there is evidence that some practitioners never meet with their clients.  The attorney's legal assistant meets with debtors and all communication goes through the legal assistant rather than

the attorney.  All petitions, the Schedules, the SOFA and other filings are prepared solely by the legal assistant, rather than during a personal, face-to-face meeting between the debtor and the attorney-in-charge.  Then, when the debtors have to appear in court or at a meeting of creditors, the attorney who meets them is not the attorney they retained, but rather an appearance attorney. *See* Robert C. Furr, *Trustee Talk, the 15 Most Common Attorney Mistakes in Consumer Cases*, 28-6 ABIJ 26, 27 (July 2009).  The thought of an attorney "representing" debtors without ever meeting with them face-to-face is as terrifying as it is appalling.  Such a lackadaisical approach to lawyering is an affront to the very profession, as well as the judicial system as a whole.

Ultimately, use of appearance attorneys constitutes improper representation for an attorney's client.  The client did not hire the appearance attorney and, almost always, the client has little or no say as to whether the attorney they *did* hire will represent them at any given proceeding.  Often, debtors are given no notice that their own attorney will not personally represent them at their meeting of creditors or at any hearing.  *See*, *e.g.*, *In re Bernhardt*, 2012 WL 646150, at *5 (finding the attorney failed to disclose to his clients his intent to send an appearance attorney to represent them at their meeting of creditors).  If any notice is given to the debtors, it is generally a phone call earlier that same day.  *See In re Johnson*, 411 B.R. at 301 (where debtor received a call the morning of her meeting of creditors to let her know that her attorney would not be meeting her at the courthouse).  Even where some notice is given, it is often protracted and provided at such a time as to deprive the debtor of any choice but to allow the appearance attorney to represent him or her.  *See id.*

Indeed, this is exactly what happened in the case at bar.  Ms. Bradley arrived before her January 8 meeting of creditors to find a lawyer she had never met before waiting to represent her and her husband's interests.  [Finding of Fact No. 39].  This lawyer, Carter, has appeared on

behalf of the Firm's attorneys for the last several years, receiving payment for each meeting or hearing he attends. [Finding of Fact Nos. 52, 54]. Due to Aduwa's failure to communicate with Carter, Carter was not adequately prepared for the creditors' meeting held on January 8 and was unable to resolve issues brought up during the meeting, not the least of which were the inaccuracies contained in the Amended Conversion Schedules and the Amended Conversion SOFA. [Finding of Fact No. 53]. Two weeks later, at the January 22 continued meeting of creditors, Carter again made an appearance on behalf of, and much to the surprise of, the Debtors, who were never notified of this arrangement. [Finding of Fact No. 56]. And, once again, Carter could not effectively represent the Debtors due to his lack of knowledge about their file.

Such a practice is harmful to the bankruptcy system. In addition to the problems of communication and accountability outlined above, sending an appearance attorney to represent debtors undermines the integrity of the legal process. Debtors seek out and hire a specific firm to handle their bankruptcy case. The debtors meet and build a relationship with the specific attorneys at the firm they hire, and there is a level of comfort that comes from seeing a friendly and competent figure stand to address creditors or the Court on their behalf. Lawyers who send appearance attorneys to meetings of creditors or hearings in their place leave a bad and lasting impression on their clients. This practice reflects poorly on the debtor's attorney, other attorneys, the bankruptcy process, and the judicial system in general. It must stop.

2. Going Forward, Appearance Attorneys May Not Be Used In Cases Over Which the Undersigned Judge Presides

Several sources permit this Court to prohibit the further use of appearance attorneys. First, § 105 authorizes this Court to issue any order necessary or appropriate to carry out the provisions of the Code or to prevent an abuse of process. Courts have used §105(a) to prevent an

abuse of process. *See Jacobsen v. Moser* (*In re Jacobsen*), 609 F.3d 647, 658 (5th Cir. 2010) (holding that the bankruptcy court had authority to convert a Chapter 13 case to one under Chapter 7 because a debtor's right to dismissal is qualified by the bankruptcy court's power under 105(a) to "police bad faith and abuse of process"); *In re Volpert*, 110 F.3d 494, 500 (7th Cir. 1997) (holding that §105(a) permits bankruptcy courts to issue an order or sanction an attorney who "unreasonably and vexatiously multiplies proceedings before them"); *Kelly v. Herrell* (*In re Kelly*), 392 B.R. 750, 752 (W.D. Wis. 2007) (affirming bankruptcy court's decision to enter an order requiring the debtor to obtain leave of the court before filing any future bankruptcy case due to the debtor's alleged abuse of process).   Here, the use of appearance attorneys is undermining the efficient and effective administration of the bankruptcy system because trustees (at meetings of creditors) and judges (at hearings) find themselves dealing with lawyers who are not fully informed about the debtors' cases (as required by Local District Rule 11.2).   Moreover, the use of appearance attorneys also constitutes an abuse of the legal process: debtors' rights to choose their own attorneys (with the expectation that a particular attorney or attorneys will zealously represent their interests) are being sacrificed at the altar of fee maximization.   For these reasons, the Court invokes § 105(a) to issue an order preventing the use of appearance attorneys by debtors' counsel.

Further, Bankruptcy Rule 9029(b) allows judges to control the practice of attorneys who appear before them:

> Procedure when there is no controlling law.   A judge may regulate practice in any manner consistent with federal law, these rules, Official Forms, and local rules of the district.   No sanction or other disadvantage may be imposed for noncompliance with any requirement not in federal law, federal rules, Official Forms, or the local rules of the district unless the alleged violator has been furnished in the particular case with actual notice of the requirements.

This Rule allows judges to regulate practice when there is no controlling law, so long as such regulation is consistent with all other law and rules. *See In re Wideman*, 84 B.R. 97 (Bankr. W.D. Tex. 1988). There is no federal law or local rule governing appearance attorneys; however, Local Bankruptcy Rule 1001-1, and Bankruptcy Rule 9029(b), taken together, authorize this Court to regulate practice before it. As part of that regulation, this Court may prohibit use of appearance attorneys. Such a prohibition does not conflict with any other law or rule, and "carries forward the purposes of the Bankruptcy Act and keeps faith with the policies embodied therein." *In re Wideman*, 84 B.R. at 99 (citing *Matter of Adams*, 734 F.2d 1094 (5th Cir. 1984)).

Various courts around the country have taken different steps to combat the problem that appearance attorneys pose to courts and clients. Several courts have held that, unequivocally, there must be disclosure to both the court and the client before an appearance attorney may be used. *See, e.g.*, *In re Wright*, 290 B.R. at 155–56 (holding that disclosure to the court is an absolute requirement of the bankruptcy process). Additionally, those courts require the debtor's attorney to obtain the debtor's consent before an appearance attorney can be used. This consent cannot be obtained just prior to a scheduled meeting or hearing, and must be real, true consent, with the debtor having the option of demanding that their attorney of record be present. *See In re Bernhardt*, 2012 WL 646150, at *5; *In re Johnson*, 411 B.R. at 301; *In re Wright*, 290 B.R. at 156. Thus, the move by courts, in several areas of the country, is toward requiring that all attorneys that appear before a court be disclosed and be enrolled as a co-counsel. *See, e.g.*, *In re Johnson*, 411 B.R. at 302.

The undersigned judge fully supports this trend, but chooses to go one step beyond. Going forward, in cases adjudicated by the undersigned judge, no attorney shall represent a

debtor in a case, whether it is at an actual hearing, a meeting of creditors, or any other proceeding, unless that attorney is enrolled as the attorney-in-charge or practices at the attorney-in-charge's firm as an associate or a partner.  The undersigned judge recognizes that the other bankruptcy judges in the Southern District of Texas may not agree with this ruling.  The undersigned judge wants to emphasize that this ruling applies *only* to those cases assigned to the undersigned judge and does *not* apply to those bankruptcy cases assigned to other judges in this District.

## V. CONCLUSION

In the case at bar, Aduwa showed poor judgment to an extreme degree.  His handling of the conversion of the Debtors' bankruptcy case displays a reckless disregard for his duties as an attorney at law—directing the filing of materially inaccurate documents, failing to meet personally with the Debtors before filing the Notice of Conversion, failing to meet with the Debtors in person to review the Initial and Amended Schedules and the Initial and Amended SOFA before filing those documents, orchestrating the forgery of the Debtors' electronic signatures, filing an inaccurate Rule 2016 Disclosure, failing to appear on behalf of the Debtors at two separate meetings of creditors, and allowing his legal assistant to practice law by preparing and filing documents with virtually no supervision.  These actions violate the Bankruptcy Code, the Bankruptcy Rules, the Local District Rules, and the Local Bankruptcy Rules.  Any of these actions alone is an affront to the dignity of the judicial system in general, and this Court in particular.  Taken together, they are a full-frontal attack.

The Firm, too, has displayed a marked lack of competence, care, and concern in the handling of this and similar cases.  The Firm has been subject to sanctions previously, and has been called to account for the misconduct of its employees.  Despite assurances from Macey and

Aleman in 2010 that problems would be corrected and that the proper training and oversight mechanisms would be put in place, the Firm's woeful representation of the Debtors in this case, and its representation of debtors in the courts that have issued the opinions discussed herein, demonstrates that the Firm has failed to rectify its problems. It is no small irony that the only area in which the Firm has excelled—at least in the Southern District of Texas—is in its choice of outside counsel to represent it after a show cause order is issued. In 2010, the Firm retained David Jones, a first rate practitioner at that time and now a sitting bankruptcy judge in the Southern District of Texas. In the case at bar, it has retained Kirkendall, another superb attorney. If the Firm would only train its attorneys to strive for the level of competence and candor exhibited by Jones and Kirkendall, the Firm would assuredly keep itself out of harm's way. If, however, the Firm continues to do such a haphazard job training and supervising its personnel, it will not only earn the reputation of being the lowest common denominator in the practice of consumer bankruptcy law; it will become a cancer on the legal profession.

The Court thanks Kirkendall for his candor in the SCO Response that he filed on behalf of the Firm, as it admits that the representation of the Debtors was poor and sets forth the remedial steps that the Firm has taken since receiving the SCO. Nevertheless, the Firm represented to this Court in *Salinas* and *Williams* in 2010 that it would correct the problems outlined in the show cause orders relating to those two cases. The misconduct of Aduwa and Gutierrez shows that it did not do so. By imposing the sanctions that it does today, the Court hopes not only to send a message to the Firm—so that it fully and finally rectifies the problems described herein—but also to send a message to other attorneys and firms—particularly "mill" firms—practicing consumer bankruptcy law. Attorneys and firms must be diligent, truthful, careful, and respectful in their representation of clients and in their interactions with the Court.

Finally, the prolific use of appearance attorneys must end. Regardless of their competence or skill as lawyers, such attorneys are not a client's chosen lawyers. In this country, clients are, and should always be, given the final say as to who represents them. The use of appearance attorneys deprives clients of that right. Such a practice is insulting to the client, the Court, and the principles upon which the judicial system is built. The use of un-named and undisclosed appearance attorneys is unacceptable and will no longer be tolerated in this Court. Attorneys are not fungible. Attorneys are not all equal to each other, either in their courtroom abilities, their understanding of the law, or in their communicative skills. Clients choose a firm and an attorney for a reason, and clients have a right to be represented by the attorney of their choice during all portions of their case. The justification from certain consumer bankruptcy attorneys that their business model will not work unless they are allowed to use appearance attorneys holds no water with this Court. If a firm's business model conflicts with the professional standards of the legal profession, the former must give way to the latter.[39]

---

[39] The undersigned judge has numerous solo practitioners who frequently appear in his courtroom representing debtors. Many of these practitioners are very capable lawyers, who, when they take on representation of a debtor, handle the case properly "from soup to nuts." They have no need for appearance attorneys, as they are well organized, technologically up to date, and do not run their law practice on a mass volume basis. Yet, these attorneys, as evidenced by the fact that they have been representing debtors for years, have a business model that has proven successful (This Court frequently reviews the invoices of these attorneys when they submit their fee applications, and these attorneys are certainly earning reasonable, if not substantial, fees). Indeed, the undersigned judge's experience is that these practitioners rarely have debtor-clients who, like Ms. Bradley, bitterly complain to the Court about the poor representation provided by the so-called "mill" firms—of which the Firm is the quintessential embodiment. Indeed, almost simultaneously with the hearings in this Court on the misconduct of the Firm and the use of appearance attorneys by the Firm, the undersigned judge has had to hold hearings on another so-called "mill" firm where a debtor-client complained about inattentiveness of the attorneys from the law firm she retained and that firm's use of an appearance attorney in her case who was not fully informed about her file. *See In re Mioshi Yumeki Harmon*, Case No. 11-37913, (Bankr. S.D. Tex.).

An Order consistent with this Memorandum Opinion will be entered on the docket simultaneously herewith.

Signed this 16th day of July, 2013.

_____

Jeff Bohm
Chief United States Bankruptcy Judge